# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Kyko Global, Inc., Kyko Global GmbH, Prithvi Solutions, Inc., | |
| *Plaintiffs*, | Civil Action No. 2:18-cv-01290-WSS |
| v. | *Electronically Filed* |
| Prithvi Information Solutions, Ltd., Value Team Corporation, SSG Capital Partners I, L.P., SSG Capital Management (Hong Kong) Limited, Madhavi Vuppalapati, Anandhan Jayaraman, Shyam Maheshwari, Ira Syavitri Noor a/k/a Ira Noor Vourloumis, Dinesh Goel, Wong Ching Him a/k/a Edwin Wong, Andreas Vourloumis, Prithvi Asia Solutions Limited, | |
| *Defendants*. | |
| SSG Capital Partners I, L.P., and SSG Capital Management (Hong Kong) Ltd., | |
| *Counterclaim & Third-Party Plaintiffs,* | |
| v. | |
| Kyko Global, Inc., Kyko Global GmbH, and Kiran Kulkarni, | |
| *Counterclaim & Third-Party Defendants.* | |

**AMENDED ANSWER, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT**

SSG Capital Management (Hong Kong) Ltd. ("SSG Capital Management") and SSG Capital Partners I, L.P. ("SSG Fund I") (together, "SSG") hereby amend their pleadings to assert Counterclaims and a Third-Party Complaint in this action.  SSG Capital Management and SSG Fund I wholly incorporate their original Answers, docketed at ECF No. 139, pursuant to Federal Rule of Civil Procedure 10(c).

## <u>INTRODUCTION</u>

1.      This action is an integral part of an illicit, malicious campaign against SSG. Plaintiffs Kyko Global Inc. and Kyko Global GmbH (together, "Kyko"); their director and CEO, Kiran Kulkarni ("Mr. Kulkarni"); their associates, including Tejesh Srivastav & Associates; and their legal counsel have continually abused this litigation, and perverted legal processes within it, to create pressure for their ongoing covert campaign to improperly extract money from SSG Fund I and SSG Capital Management.  Kyko and Mr. Kulkarni have perpetuated the following multi-faceted scheme.

2.      *First*, they have abused (and continue to abuse) legal process in jurisdictions around the world, including civil lawsuits, bankruptcy proceedings, collection actions, subpoenas, letters rogatory, and depositions.  This lawsuit itself has been perverted and used as a tactical weapon to coerce a desired result that is not the legitimate object of the process.

3.      *Second*, Kyko and Mr. Kulkarni have actively sought to disrupt business and investor relationships of SSG Fund I and SSG Capital Management.  Coordinating with Tejesh Srivastav & Associates, Kyko and Mr. Kulkarni have directed numerous anonymous emails—leveraging threats of negative media articles, investor and donor scrutiny, public embarrassment, and professional fallout—to coerce investors to stir up frivolous litigation or withdraw their investments in SSG (the "Anonymous Emails").  They have threatened to use the existence of this RICO lawsuit as basis to accuse SSG's investors of neglecting their fiduciary duties.  Some

Anonymous Emails urged investors to "reconsider" their "investments in SSG Capital" or to "ignore all drawdown notices from SSG." Others have attempted to damage investor confidence in and investments with SSG.

4.      These improper contacts with SSG's investors were intended to pressure SSG into settling with Kyko and Mr. Kulkarni. For example, Tejesh Srivastav tried to persuade an SSG business partner to "convince Shyam Maheshwari that indeed it may be in his interest to resolve this matter" because "Kiran [Kulkarni] is not going to go away." Another Anonymous Email, directed by Kyko and Mr. Kulkarni, urged, "[t]he next best alternative may be to use your good offices with SSG advising them to settle the matter at the earliest. Weeks will be too late."

5.      ***Third***, to increase settlement pressure, Kyko and Mr. Kulkarni directed efforts to upend other SSG business deals. In April 2020, Kyko and Mr. Kulkarni directed more Anonymous Emails be sent to employees of a company that was being acquired by SSG, explicitly urging the employees to try to prevent SSG's acquisition. The employees were urged to send information to journalists who had previously run negative stories about SSG to which Kyko, Mr. Kulkarni, and Mr. Srivastav had contributed. The employees were also directed to create regulatory problems for SSG with the Reserve Bank of India ("RBI") based on Kyko's false allegations in this action: "Kyko's lawsuit and its implications should be clearly spelt out to RBI." Kyko and Mr. Kulkarni, working with Mr. Srivastav, also attempted to generate a "whistleblower complaint" related to a United States investment. Kyko and Mr. Kulkarni have continued these efforts to the present.

6.      ***Fourth***, Kyko, Mr. Kulkarni, and their co-conspirators and associates, including Tejesh Srivastav & Associates, have engaged in a coordinated media smear campaign—in particular highlighting this lawsuit's unfounded RICO claim—to impugn the integrity of SSG

Fund I, SSG Capital Management, and their principals.  Kyko and Mr. Kulkarni have instigated,

contributed to, and promoted these false and misleading media stories.  Kyko has publicly

advertised news articles about the lawsuit on its website's "About Us" page.  Tejesh Srivastav, as

an "advisor" to Mr. Kulkarni, has given false, misleading, and inappropriate statements about the

lawsuit to media personnel.  And Kyko and Mr. Kulkarni, either directly or through affiliates,

have sent extortionate communications to SSG Fund I, SSG Capital Management, their

principals, and their investors repeatedly threatening additional media publicity—in the New

York Times and the Wall Street Journal—if their unfounded demands are not met.  Attempting

to leverage this pressure, early in this case, Kyko's general counsel, Jayson Macyda, offered

Kyko's media silence if the SSG Defendants[1] agreed to settlement discussions on Kyko's

extensive terms.

       7.    ***Fifth***, having used other elements of this scheme to exert pressure on their targets,

Kyko and Mr. Kulkarni directed a covert campaign at SSG Fund I, SSG Capital Management,

and their principals, seeking to obtain unjustifiable payments to make Kyko cease its malicious

campaign.  In some cases, Mr. Kulkarni or Mr. Srivastav contacted SSG directly.  More often,

this campaign took the form of Anonymous Emails threatening additional legal action,

misleading media publicity, regulatory problems, and further interference with SSG's investors.

These emails nearly always end by trying to force a settlement between Kyko and SSG.  For

example, one Anonymous Email offered to help SSG's principals "manage the risk from the

Kyko-Prithvi imbroglio"  before Kyko began to use a "scorched earth strategy disseminating this

information to all stakeholders and media," which actions might "have [them] individually

---

[1] The "SSG Defendants" include only SSG Capital Partners I, L.P. ("SSG Fund I"), SSG Capital
Management (Hong Kong) Ltd. ("SSG Capital Management"), Value Team Corporation
("VTC"), Edwin Wong, Andreas Vourloumis, Shyam Maheshwari, Dinesh Goel, and Ira Syavitri
Noor.

ejected from the management company."  Over a month before this lawsuit was filed, an Anonymous Email threatened that Kyko would soon file "a civil lawsuit invoking RICO," which would be used to impact SSG's relationships with investors, create negative publicity and increase regulatory scrutiny.

8.     After this lawsuit was filed, another Anonymous Email similarly warned that the suit "could be debilitating to SSG and most embarrassing" to its investors, and then offered to "help facilitate a settlement."  Yet another warned:  "The lawsuit by Kyko is the beginning of a strategy that Kyko will follow to recover the funds that they have lost and is designed for maximum repercussions in India with the regulators and on your investors in the US and elsewhere."  And still another made the usual litany of threats about investor fallout and high-profile news stories before urging SSG to "get[] Kyko to drop all other claims" and "[e]nsure that Indian media … stops carrying this story and stops digging further."

9.     In short, this case has always been a tactic in Kyko's and Mr. Kulkarni's "scorched earth strategy" to extract money from SSG Fund I and SSG Capital Management. These actions are a perversion of legal process and constitute an abuse of process under Pennsylvania law.  Moreover, Kyko and Mr. Kulkarni have maliciously interfered with SSG's investors, business relations, and business transactions.  This interference has been ongoing and still continues.

10.    Kyko and Mr. Kulkarni's covert scheme depends on the continued existence of this lawsuit, particularly its RICO count, to leverage pressure.  Accordingly, Kyko and Mr. Kulkarni, through their legal counsel, have intentionally abused legal processes in this action in order to prevent dismissal and maintain the existence of this frivolous case.  Among other things, they have deliberately:  (i) made false allegations without any factual basis; (ii) filed sworn

affidavits under penalty of perjury containing false and misleading statements with the specific intent to mislead the Court; (iii) attempted to delay proceedings through bad-faith arguments and misrepresentations; and (iv) relied on forged and fraudulent documents to support their false claims.

11.     In particular, Mr. Kulkarni has himself filed several sworn affidavits under penalty of perjury in which he knowingly asserted false and misleading statements in order to mislead the Court and maintain the existence of this action.

12.     These abusive legal practices and bad-faith litigation tactics have been specifically intended to prevent dismissal of this meritless case so that it can be used in further media campaigns, additional investor harassment and business disruption, and the ongoing extortionate efforts to extract money from SSG Fund I, SSG Capital Management, and their principals.

13.     It is well past time that Kyko and Mr. Kulkarni answer for their actions. Accordingly, SSG Capital Management and SSG Fund I now assert Counterclaims and a Third-Party Complaint against Kyko Global Inc., Kyko Global GmbH, and Mr. Kulkarni in order to right these wrongs.

## **PARTIES**

14.     Counterclaim and Third-Party Plaintiff SSG Capital Management is a Hong Kong entity with its principal place of business in Hong Kong.  SSG Capital Management serves as the headquarters of the SSG group, one of the largest credit and special situations firms in the Asia-Pacific region founded in 2009 by former Lehman Brothers executives.  The SSG group has raised funds from a large number of institutional investors across North America, Europe and Asia, including sovereign wealth funds, U.S. state pension funds, university endowment funds and insurance and corporate pension funds who have entrusted their capital with the SSG group.

5

15. Counterclaim and Third-Party Plaintiff SSG Fund I is a Cayman Islands entity with its principal office in the Cayman Islands, and is part of the SSG group.

16. SSG Fund I and SSG Capital Management assert the below counterclaims and third-party complaint solely on behalf of themselves and not on behalf of any other SSG Defendant in this action.

17. Counterclaim Defendant Kyko Global, Inc. is a Canadian corporation with its principal place of business purportedly located in Ontario, Canada.

18. Counterclaim Defendant Kyko Global GmbH is a Bahamian corporation with its principal place of business purportedly located in New Providence, Bahamas and is a wholly owned subsidiary of Kyko Global Inc.

19. Third-Party Defendant Kiran Kulkarni is a director and the chief executive officer of Kyko Global Inc. and Kyko Global GmbH.

## JURISDICTION & VENUE

20. This Court has jurisdiction over these counterclaims under 28 U.S.C. § 1367(a) because this Court has held that it has original subject-matter and diversity jurisdiction over the underlying action and these counterclaims are closely related to Plaintiffs' claims in the underlying action such that they form part of the same case or controversy.

21. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims below occurred in this district and because Kyko and Mr. Kulkarni have submitted themselves to this Court's personal jurisdiction by authorizing, filing, prosecuting, and misusing this action.

## GENERAL ALLEGATIONS

I.    **SSG Fund I and VTC legally acquired and owned all of PISL's Bonds, and were defrauded when PISL failed to satisfy its debt.  Kyko separately executed reckless factoring agreements with PISL and its affiliates, lost money due to PISL's fraud, obtained *ex parte* default judgments against PISL and its affiliates, and weaponized those outsized judgments to "collect" against unrelated third parties.**

   A.    **SSG Fund I and VTC legally acquired and owned PISL's Bonds, and attempted to restructure them; the restructuring and subsequent settlement failed and SSG Fund I and VTC were thereby defrauded.**

22.    In February 2007, Prithvi Information Solutions, Ltd. ("PISL" or "Prithvi")—an Indian IT company publicly traded in India—issued $50 million face value of foreign currency convertible bonds (the "Bonds") pursuant to detailed terms and restrictions in a Bond Offering Circular (the "Bond Circular").  The Bonds were zero coupon and had a yield to maturity of 8.58% per annum compounded semi-annually.  *See* Ex. 1 (Bond Circular) at 11, 93.  On the Bonds' Maturity Date of February 26, 2012, assuming no prior redemption, repurchase, cancellation, or conversion, PISL would owe the Bondholders 152.2% of the face value of the Bonds—over $75 million in total (the "Redemption Value").  *Id.* at 1, 94.

23.    To collateralize this debt, the Bond Circular bound PISL and its subsidiaries and affiliates (collectively, the "Prithvi Group") to detailed, restrictive covenants in favor of the trustee and the Bondholders, including specific financial covenants and the grant of secured interests in the assets and receivables of the Prithvi Group, as well as secured interests in the shares of any entities acquired by any member of the Prithvi Group.  *See id.* at 42–64.  If PISL breached any of these restrictions, the trustee could foreclose on the Bonds, making PISL immediately liable to the Bondholders for most, if not all, of the Redemption Value.  *Id.* at 101. The Bond Circular has been publicly available on the Singapore Stock Exchange where the Bonds were listed.

7

24.     The proceeds from the Bonds' issuance (the "Bond Proceeds") were put in an escrow account independently managed by an escrow agent and a trustee.  Between 2007 and mid-2010, PISL applied for several releases from the escrow account—totaling around $19 million—and transferred most of that money to a wholly owned subsidiary, Prithvi Solutions, Inc. ("PSI"), in the form of "loans/advances."  The audited financials of both PISL and PSI in relevant years expressly noted that the Bond Proceeds transferred from PISL to PSI were treated only as "loans" that were "re-payable on demand."

25.     Nothing in PISL's or PSI's financial statements suggests that PSI was ever granted exclusive title to or interest in the Bond Proceeds.  Moreover, PSI did not exist when the Bonds were issued.  More importantly, under the Bond Circular, PSI could not have been granted exclusive title to or interest in the Bond Proceeds without the consent of the Bondholders, and no consent was ever given.

26.     PISL floundered financially after the Global Financial Crisis, thereby devaluing the Bonds, so SSG Fund I and VTC were able to acquire, in the secondary markets, all of the Bonds in 2009 and 2010 (in three tranches) for a discount.  Kyko has expressly conceded that these transactions were "arm's length" and "did not involve deception or fraud."  Compl. ¶ 106.  By the end of 2010, then, SSG Fund I and VTC were the only Bondholders, collateralized by secured interests in the assets of the Prithvi Group and entitled to redeem the Bonds for the Redemption Value in February 2012.

27.     Given PISL's financial condition, SSG Fund I and VTC agreed to restructure the Bonds, executing memoranda of understanding ("MOUs") with Prithvi Solutions Asia Limited ("PSAL"), an indirect subsidiary of PISL, that contemplated restructuring terms generally as follows, subject to regulatory approval:  (i) roughly one-third of the Bonds would be written off;

(ii) PISL would buy back another third or so from SSG Fund I and VTC in cash; and (iii) the final third would be converted into equity shares or similar securities of PISL (the "Restructuring MOUs"). The Restructuring MOUs were governed solely by the laws of Hong Kong. True and correct copies of the Restructuring MOUs are attached as Exhibits 2, 3, and 4.

28.     In exchange for SSG Fund I's and VTC's commitments to this restructuring plan, PSAL agreed to, and did, provide them "non-refundable deposits" that generally reflected the value of the buyback payments under the proposed restructuring. The Restructuring MOUs each provided that, *if* the restructuring was approved and occurred, PSAL and PISL could then deduct the value of the already paid non-refundable deposits from the buyback payments still due. *See* Exs. 2, 3, 4 at 5. This also meant that the Bonds would not actually be restructured, including that the Bonds would not be converted into new debt instruments, redeemed, or simply forgiven, until the necessary approvals were in fact received by PISL.

29.     The restructuring never happened because, despite SSG's efforts to work with PISL in doing so, PISL failed to obtain regulatory approval as required. Thus, in late 2013, (and after SSG Fund I acquired VTC's Bonds as well) SSG Fund I entered into a settlement agreement with PSAL and PISL under which PISL and PSAL would pay SSG Fund I roughly $10 million as satisfaction for PISL's outstanding, overdue debt to SSG Fund I of over $53 million. *See* Ex. 5 (Bond Settlement Agreement). This settlement agreement, as with the Restructuring MOUs, was governed exclusively by Hong Kong law, which would have been the proper forum for any disputes on such agreements.

30.     PSAL and PISL breached that settlement agreement and did not pay SSG Fund I any amount that was owed. At that point, the Prithvi Group and its principals were clearly insolvent and generally resistant to collection efforts. So, rather than expending significant time,

money, and effort attempting to recover the over $50 million it was owed for the Bonds—likely

bits and pieces at a time, with unknown chances of success—SSG Fund I made the business

decision in 2014 to write down the value of its Bond investment.

31.     Each and every one of these transactions—the purchase of the Bonds, the

attempted restructuring, the non-refundable deposits, the settlement, and the write down—was

legal and valid under applicable laws and regulations.

> **B.     Kyko obtained and weaponized judgments against PISL and its affiliates,
> and then improperly expanded its "collection" campaign to attack unrelated
> third parties, such as SSG.**

32.     In late 2011, unrelated to any of the above transactions, Kyko executed factoring

agreements with PISL and some affiliate entities.  Kyko was to collect the accounts receivable of

the Prithvi entities in exchange for advancing to them a portion of the value of the accounts after

deducting fees and interest for its services.  As it turned out, however, the supposed receivables

and related companies proffered by Prithvi were actually fake, created and maintained only on

paper primarily by PISL's Chairperson, Madhavi Vuppalapati, and PISL's Assistant Vice

President of Finance and Accounts, Guru Pandyar.  Kyko supposedly lost around $17.5 million

in early 2013 as result of these frauds.

33.     In June 2013, Kyko sued 21 entities and individuals associated with PISL in

federal court in the Western District of Washington—including PISL, its wholly owned

subsidiary PSI, Madhavi Vuppalapati, and Guru Pandyar—asserting claims for, among other

things, fraud, breaches of guarantee agreements, and civil RICO violations.  *See Kyko Glob. Inc.
v. Prithvi Info. Sols. Inc.*, No. 13-cv-1034 (W.D. Wash.) (the "Washington Federal Litigation").

Less than three months later, Kyko obtained an "interim judgment" for its purported losses

against twelve of the defendants—including PISL, PSI, and Ms. Vuppalapati—based on

confessions of judgments signed by each of those defendants and Kyko's allegations that they

had breached a settlement agreement (the "Prithvi Interim Debtors"). *See id.* at ECF 25, 43–55, 70, 73.

34.     Kyko immediately entered the interim judgment in the Washington Superior Court and engaged in concurrent supplemental proceedings in state court to collect on the roughly $17.5 million judgment owed by the twelve Prithvi Interim Debtors. *See Kyko Glob. Inc. v. Prithvi Info. Sols. Ltd.*, No. 13-2-41165-2 SEA (Wash. Super. Ct. King. Cty.) (the "Washington Collection Proceedings").

35.     Through the Washington Collection Proceedings, Kyko executed attachments on the Prithvi Interim Debtors' property and garnished many purported debts owed by third-party entities and individuals.  In early 2014, Kyko also obtained the hard drive to Madhavi Vuppalapati's computer by forcing a sheriff's sale of Ms. Vuppalapati's personal property and then purchasing the computer at the auction.

36.     As a result of its various collection activities, Kyko has recovered to date all or nearly all of the $17.5 million it purportedly lost to Prithvi.  Meanwhile, SSG has not recovered any of the over $50 million it lost to Prithvi's fraud, and instead has only been dragged into this litigation.

37.     But Kyko was not satisfied to merely collect on its existing judgment through legitimate processes.  Instead, Kyko manipulated both the Washington Federal Litigation and the Washington Collection Proceedings to expand its judgment in order to collect from any conceivable source—no matter how frivolous.

38.     In July 2014, Kyko conscripted Guru Pandyar to assist in its "collection" campaign through a coercive settlement and cooperation agreement with Mr. Pandyar and his wife.  The Pandyars had declared bankruptcy because of Kyko's claims in the Washington

Federal Litigation and were under FBI investigation.  Kyko agreed to dismiss its claims against

the Pandyars and provide them good references in their criminal proceedings in exchange for

their assistance in providing Kyko as much information and testimony as it might want to

recover on the interim judgment, any future judgments, and "any other litigation as it may relate

to said financial schemes."  *See* Ex. 6 (Pandyar Cooperation Agreement) at 2.  The Pandyars

were (and still are) forced to help Kyko for "as long or as often as necessary."  *Id.*  If they

decline—or if Kyko deems that they have not been helpful enough—Kyko can "declare the

Agreement null and void," reinstitute its claims against them for millions of dollars, and

withdraw its recommendations in their criminal proceedings.  *Id.* at 4.

39.     Eventually, Guru Pandyar was indicted for wire fraud and money laundering

conspiracy in the Western District of Washington based on his actions in helping to defraud

Kyko.  Mr. Pandyar has pleaded guilty to wire fraud and money laundering and, as of the date of

this filing, is awaiting sentencing.  He has requested leniency based on his purported cooperation

with Kyko.  Kyko has promised to "urge the prosecutorial authority and the Court not to impose

a sentence of imprisonment" upon Mr. Pandyar in exchange for his continued assistance and

testimony. *See id.* at 3.

40.     In early 2016, Kyko obtained an order of default in the Washington Federal

Litigation against thirteen of the Prithvi defendant entities, including PISL and PSI, for failure to

appear, plead, or otherwise defend the case.  Then, in June 2016, the district court conducted an

*ex parte* bench trial in which none of the defendants appeared or offered any evidence or

testimony.  Based on Kyko's unopposed evidence and the self-serving testimony of Mr. Kulkarni

and Guru Pandyar, the court granted Kyko final judgment on all of its claims.  *See* Washington

Federal Litigation at ECF 394.  The district court also awarded Kyko treble damages on its

unopposed civil RICO claim, totaling over $100 million including interest—nearly six times the amount that Kyko purportedly lost to Prithvi's fraud.  *See id.* at ECF 410.

41.     Meanwhile, in the state-court collection proceedings, Kyko moved for the appointment of a "referee"—essentially a private arbitrator—to handle only certain administrative and scheduling concerns, but thereafter reversed course and began demanding that the referee issue substantive orders, including that some of the Prithvi Interim Debtors turn over their property directly to Kyko.  There is no statutory process under Washington law for a referee to order such a direct turnover of property.  Yet many of Kyko's improper motions were granted essentially *ex parte* in short order without any public notice.

42.     Kyko's improper attempts to collect on its judgment from the Prithvi Interim Debtors through invalid *ex parte* orders and without notice to PISL's creditors violated the terms of the Bonds, under which SSG Fund I was entitled to secured pledges of PISL's and its subsidiaries' and affiliates' assets.  SSG has not recovered its debt it was owed pursuant to its Bond holdings.

43.     For example, Kyko manipulated procedures to obtain an order directing PSI to turn over shares of its subsidiary Agadia Systems, Inc. directly to Kyko.  No notice of this was given to—and no consent received from—PISL's creditors, including SSG Fund I.  This purported direct turnover of Agadia's shares violated not only Washington law, but also the Bonds' terms, under which SSG Fund I was entitled to a secured pledge of Agadia's shares.

44.     Similarly, Kyko obtained an order granting Kyko purported authority to act as a "collection agent" for alleged "accounts receivable" listed on a purported unaudited PSI balance sheet from March 2013 (the "March 2013 Balance Sheet"), described in more detail below, even though there is no such process under Washington law (the "Collection Agent Order").  SSG

Capital Management later challenged the Collection Agent Order based in part on the lack of any supporting evidence to show that the amounts listed in March 2013 Balance Sheet actually exist. The Washington Superior Court acknowledged its mistake and clarified its order to note that it did not, and could not, decide whether any amounts listed on the March 2013 Balance Sheet were in fact legitimate.

45.     Finally, Kyko demanded and obtained a putative "order" from the referee—which was never confirmed by the Superior Court—that PISL and PSI had to turn over and reissue PSI's shares directly to Kyko Global GmbH, even though the referee indisputably had no such authority and no such procedure exists under Washington law.  Once again, no notice was given to PISL's creditors, including SSG Fund I.  Even if this order had operative effect (which it did not), SSG Fund I's rights as PISL's Bondholder would have been violated.

46.     Then, further showing how one-sided this process was, Kyko unilaterally appraised PSI and reported back to the referee over a year later that PSI—which supposedly possessed millions of dollars in "accounts receivable"—was worth *only $10* and so reduced its judgment by only that amount.  As explained below, however, Kyko never actually obtained PSI's shares.  Even if it had, this invalid process would have violated the rights of SSG Fund I as a creditor under the terms of the Bonds.

47.     Eventually, as a result of its concurrent manipulation of state and federal proceedings, Kyko was finally armed with a massive *ex parte* judgment against various Prithvi-related persons and entities; a few illegitimate *ex parte* orders purporting to authorize Kyko to collect directly from PSI's debtors; information, documents, and emails from Ms. Vuppalapati's computer; and at least two "witnesses"— Mr. Kulkarni and Guru Pandyar—who have displayed their willingness to swear to false statements under oath.

14

**II.     Kyko, Mr. Kulkarni, and their associates have abused this frivolous lawsuit to leverage improper settlement pressure.**

48.     Kyko and Mr. Kulkarni are well aware of the above facts related to the ownership and attempted restructuring of the Bonds.  Nevertheless, they and their associates have falsely and maliciously misrepresented these legal bond transactions to SSG's investors and business partners, regulatory authorities, several courts and tribunals, and the media more broadly, engaging in a scorched-earth, money-making scheme involving clear abuses of legal process, business interference, public disparagement, and settlement pressure.  What follows is a chronology of Kyko and Mr. Kulkarni's campaign to harass, intimidate, and improperly pressure SSG Fund I and SSG Capital Management.

**A.     May 2014 – October 2014:  Kyko's and Mr. Kulkarni's initial demands.**

49.     After obtaining Ms. Vuppalapati's computer at the sheriff's sale in early 2014, Kyko discovered through a data-recovery and computer-forensic investigator that the hard drive contained over 300,000 documents and over 30,000 emails relating to Ms. Vuppalapati's business activities with PISL, PSI, Kyko, and others, including SSG.  Mr. Kulkarni swore in an affidavit in the Washington Federal Litigation that the hard drive contains copious relevant information, and Kyko still maintains a forensic copy of the hard drive's contents at its Canadian headquarters.  ECF No. 207-7, at ¶ 4 n.1.  Kyko has since used the documents and emails from the hard drive to identify potentially solvent third parties who had once done business with Ms. Vuppalapati and who could then be targeted with threats and harassment—based on false guilt-by-association allegations—in order to extract payments to make Kyko's threats and harassment stop.[2]

---

[2] Kyko has initiated litigation against numerous companies based on any past association with Prithvi.  For example, Kyko brought a ten-count complaint against Microsoft and others in an adversary bankruptcy proceeding when Microsoft chose not to renew a contract with a former

50.     In this way, based on information and documents from Ms. Vuppalapati's hard drive related to the Bond restructuring explained above, which was attempted but never occurred, Kyko, Mr. Kulkarni, and their associates identified SSG Fund I and SSG Capital Management as targets for the campaign set forth below.

51.     In May and June 2014, Mr. Kulkarni targeted and began personally contacting principals and employees of SSG Capital Management.  He initially pretended that he was simply seeking information and asked for cooperation to work in "common interest" with the principals of SSG Capital Management.  During a phone call, Mr. Kulkarni implied that Kyko would pursue legal action against SSG if it did not agree to cooperate with Mr. Kulkarni on his terms.

52.     On June 20, 2014, Kyko served writs of garnishment from the Washington Collection Proceedings on SSG Fund I, VTC, and SSG Capital Management, demanding information and payment.  The SSG entities rejected these demands because they were unfounded:  among other things, there was no connection between SSG and Prithvi that could justify Kyko's demands for information and restraint of property.

53.     On October 21, 2014, Mr. Kulkarni emailed principals and employees of SSG Capital Management, stating that "the Prithvi saga of the past 4-5 years is probably a huge money laundering conspiracy," and requesting, "I once again urge you to work with us in putting the pieces together."  Mr. Kulkarni concluded with a threat:  "I will not be surprised if Department of Justice gets involved with this matter.  I would very much appreciate any help

---

Prithvi subsidiary, which Kyko purported to own.  *See In re Prithvi Catalytic, Inc.*, 580 B.R. 652, 656 (Bank. W.D. Pa. 2017) (dismissing Kyko Global Inc. and Kyko Global GmbH for lack of standing).

you can give us with this matter." *See* Ex. 7 (Kiran Kulkarni Emails).  As it turns out, this was only the beginning of Kyko's and Mr. Kulkarni's scheme.

> **B.     June 2016 – November 2016:  Kyko and Mr. Kulkarni weaponize their judgment against Prithvi to force third parties to settle.**

54.     On June 13, 2016—the same day the Washington federal court awarded Kyko its $100 million judgment against the Prithvi defendants—Mr. Kulkarni again contacted SSG Capital Management, attaching the judgment.  He threatened that "the hunt for assets to collect on the judgment can be stepped up.  Please let us know if you can help." *See* Ex. 7.

55.     Then, shortly after obtaining the illegitimate Collection Agent Order, Kyko and Mr. Kulkarni began making demands that SSG Fund I, VTC, SSG Capital Management, their principals, and affiliated entities pay Kyko millions of dollars based on "accounts receivable" purportedly owed to PSI.

56.     On July 20, 2016, Mr. Kulkarni submitted a sworn affidavit to a Hong Kong tribunal, seeking information from Hang Seng Bank relating to PSAL, SSG Fund I, and VTC. Ex. 8 (July 20, 2016 Kulkarni Affidavit).  Mr. Kulkarni made sworn statements that directly contradict positions he has taken in this litigation.  He also admitted that:

> a.     SSG Fund I and VTC were legitimate creditors of PISL through their Bond holdings.
>
> b.     The audited financial reports of Prithvi entities by Ram Associates in New Jersey—on which Kyko now purports to base its contract claims—contain false and fraudulent information.
>
> c.     PSI and other Prithvi Interim Debtors in the Washington Collection Proceedings had asserted that the "accounts receivable" on PSI's purported March 2013 Balance Sheet were "uncollectable."

57.     Mr. Kulkarni's July 20, 2016 Affidavit alleged only an unsupported theory of Indian and Hong Kong law.  Ignoring the clear language of the Restructuring MOUs, Mr. Kulkarni speculated that, because the Bond restructuring did not occur, the non-refundable

deposits were probably unenforceable and should be refunded.  Ex. 8.  He nowhere asserted the existence of any "loans" or "loan agreements."  Nor did he assert that only PSI had legitimate right to use or possess the Bond Proceeds.

58.    On October 27, 2016, counsel for Kyko sent a demand letter to SSG Fund I, VTC, and SSG Capital Management.  The letter echoed Mr. Kulkarni's unfounded theory under foreign law and demanded payment of $22.9 million "within 21 days of receipt of this letter." *See* Ex. 9 (Oct. 27, 2016 Demand Letter).  The letter did not mention loan agreements or any of the theories Kyko has alleged in this case.  Further, the demand letter was based on "PSI's records." *Id.*  When Kyko sent the October 27, 2016 demand letter, it knew that PSI's books and records—including the "receivables" referenced in the letter—were false and fraudulent.  The October 27, 2016 demand letter ended with a threat to instigate action by regulatory authorities and law enforcement in India and Singapore. *See id.*

59.    Kyko sent the demand letter, including the threats, solely to pressure SSG Fund I, VTC, SSG Capital Management, their principals, and affiliated entities into an unjustifiable settlement based on purported books and records that Kyko and Mr. Kulkarni knew or should have known were fraudulent.

60.    On November 15, 2016, counsel for SSG Capital Management responded to Kyko's October 27, 2016 demand letter, refusing Kyko's demand and denying that any of the SSG Defendants owed any money to PSI or any other entity associated with Prithvi. *See* Ex. 10 (Nov. 15, 2016 Response).  Kyko has falsely alleged in this action that, because of the November 2016 response letter, "PSI discovered the nature and extent of Defendants' actions," even though PSI was not copied on Kyko's demand or SSG's response.

18

61.     Ultimately, SSG was itself a victim of Prithvi's fraud and has not recovered the amounts it was owed pursuant to its ownership of the Bonds.

**C.     Late 2016 – August 2018:  Kyko and Mr. Kulkarni ramp up their illicit campaign.**

62.     Once SSG had rebuffed Kyko's unsubstantiated demand for $22.9 million, Kyko, Mr. Kulkarni, and their associates conspired to execute a multi-pronged attack to extract money from SSG Fund I, SSG Capital Management, and their principals based on false allegations concerning SSG's one-time attempted Bond restructuring with Prithvi.

63.     The campaign involved a variety of different tactics, including:

    a.      coordinating with a third-party firm to engage in investor disruption and settlement pressure;

    b.      interfering with SSG investors, business relations, and business transactions;

    c.      creating and promoting misleading media stories and threats;

    d.      attempting to generate third-party litigation against SSG entities and principals; and

    e.      suborning threatening emails from "anonymous" email senders backed by Kyko and Mr. Kulkarni.

64.     Upon information and belief, in mid-to-late 2016, Kyko hired in-house general legal counsel, Jayson Macyda, and retained a third-party firm, Tejesh Srivastav & Associates, to interfere with SSG's investors and business partners, to send threatening emails to SSG and its principals, and to generate or promote misleading media stories that negatively and falsely portrayed SSG, its principals, and investors.  These measures were meant to coerce SSG Fund I and SSG Capital Management into an unjustified settlement to alleviate the pressure.

65.     Tejesh Srivastav is an advisor to Mr. Kulkarni and has directly contacted SSG and its principals on behalf of Mr. Kulkarni.  *See* Ex. 11 (Aug. 23, 2017 Srivastav Email).  Kyko, Mr.

Kulkarni, and Mr. Srivastav and his firm have coordinated to send extortionate communications to SSG, its principals, and investors, including the Anonymous Emails.  The Anonymous Emails were sent from obvious pseudonyms:  Sanjay Seth, Jai Krishna, Neil Mansukhani, Delhi Wanderer, Norman Clarke, Jason Williams III, Currimboy Tata, Zero Darcy, General Duggal, R Aggarwal, and Robi Khabro.

66.     Kyko and Mr. Kulkarni, conspiring with, among others, Tejesh Srivastav & Associates, either sent these Anonymous Emails themselves, or caused all these Anonymous Emails to be sent.  The connection between Kyko and the Anonymous Emails is clearly described below, *infra* ¶¶ 51–84; 180–116, particularly as the Anonymous Emails:  attached documents Kyko obtained from Ms. Vuppalapati's computer; revealed information known only to Kyko or its legal counsel; referenced communications sent solely to Kyko's legal counsel; described legal action that Kyko intended to take, which later came true, such as this RICO action; and described in detail the investor harassment and media campaign that Kyko intended to carry out (and later did).  Most importantly, nearly all the Anonymous Emails explicitly sought to pressure a settlement between Kyko and SSG.

67.     In January 2017, at the direction of Kyko and Mr. Kulkarni, "Sanjay Seth" contacted an SSG principal, threatening him with Kyko's plan to interfere with SSG's investors.  "Through a colleague who has been assisting Kiran Kulkarni, I have detailed knowledge regarding your dispute with Kyko Global Inc….  Kiran specifically instructed my colleague to obtain information on the Investors in SSG Capital funds."   Making the Kyko connection clear, he wrote, "[m]y colleague also has the full docket of Kyko's evidence in this matter including information recovered from Madhavi's computer."  Sanjay Seth then said he could help SSG "reach a fair settlement" with Mr. Kulkarni:

> I can influence my colleague to withhold information from Kyko and to possibly assist you. The assistance can include giving you a heads up on Kyko's next steps as well as details of other strategies (media for eg) that Kyko is contemplating.
>
> Finally because of his proximity to Kiran, should you ever want to settle the matter he can be very helpful in ensuring that you reach a fair settlement.

68.     Days later, at the direction of Kyko and Mr. Kulkarni, "Jai Krishna" contacted several SSG principals, purporting to be a journalist "working on a story regarding Prithvi Information Solutions." Jai Krishna attached documents Kyko had obtained from Ms. Vuppalapati's computer and rehashed many unfounded theories Kyko had touted previously. After making baseless claims about supposed violations of Indian law, Jai Krishna threatened that "several US investors" had not conducted sufficient due diligence.

69.     Within a week, SSG's investors began receiving similar threatening Anonymous Emails. Tejesh Srivastav & Associates, and their affiliates, including Keith "Kiya" Wilson, began contacting SSG investors and attempting—by threats of harassment, negative media publicity, or lawsuits—to persuade those investors to put settlement pressure on SSG and dissuade them from investing further with SSG.

70.     For example, in early February 2017, at the direction of Kyko and Mr. Kulkarni, "Neil Mansukhani" emailed an SSG investor, claiming that the investor had performed inadequate due diligence on SSG, instructing the investor to "ignore all drawdown notices from SSG," and threatening negative media publicity:

21

If, however, you did not do any due diligence on this transaction then I suggest that you ignore all drawdown notices from SSG till such time that I have completed my investigation the results of which together with supporting documentation I shall share with you and with senior journalists like Gretchen Morgenson of the NYT and Paul Becker of the WSJ who till recently was based in Hong Kong and would have great insight on SSG.  I do not believe that this will be a lengthy investigation and should not take more than two weeks at the maximum.

71.     A few weeks later, at the direction of Kyko and Mr. Kulkarni, Neil Mansukhani contacted a different SSG investor, again claiming that the investor had done inadequate due diligence, urging the investor to "make some inquiries before allowing for draw-down on your commitments," and falsely alleging that "Shyam Maheshwari and possibly SSG Capital" had engaged in actions that were "if not illegal [then] certainly unethical."

72.     In follow-up emails with the investor, Neil Mansukhani revealed his connection to Kyko, saying, "I am privy to the specific information in my email because I am assisting a victim of Prithvi," and describing "documentary evidence" apparently gleaned from Madhavi Vuppalapati's hard drive in Kyko's possession.

73.     Once they had ramped up the pressure by contacting multiple SSG investors, Kyko and Mr. Kulkarni, and Tejesh Srivastav & Associates began sending new Anonymous Emails to SSG and its principals.

74.     For example, at the direction of Kyko and Mr. Kulkarni, "Delhi Wanderer" emailed SSG principals, offering to help "manage the risk from the Kyko-Prithvi imbroglio." The email explained that "Kyko has retained a consultant … to identify … investors in SSG funds."  The email then included a number of threats about the impact of not paying off Kyko before the "consultant" had finished his investor interference.  Delhi Wanderer warned that Kyko could use a "scorched earth strategy disseminating this information to all stakeholders and

22

media," which would end investor agreements "or worse have you individually ejected from the

management company":

> His assignment is almost complete and a dossier is being prepared. This will be shared with Kyko perhaps later this week. Kyko may use this information during a settlement discussion or may follow a scorched earth strategy disseminating this information to all stakeholders and media. This may lead to a termination of GP-LP agreements or worse have you individually ejected from the management company ███████████████. With University endowments investors, it is even trickier. Even one investor pulling out will have a domino effect. Over the last 18 months, the mood at LPs has changed dramatically and a hint of scandal can bring down a fund manager. Association with Prithvi and its founders AND taking advantage of your previous Lehman knowledge would probably stink as high as the Fresh Kills dump in Staten Island. This is the kind of story that Gretchen Morgenson of the New York Times is itching to get her hands on.

75.     After describing the harassment of SSG's investors, Delhi Wanderer offered a

solution for how to "negotiate a settlement with Kyko" and "protect SSG's reputation":

> In my opinion, your management company is at risk and hiring a specialist to manage this is probably not just justified but imperative.
>
> You should define this job as a long term full time position. Obviously as a full time employee he would be duty bound to keep all information confidential and his interests would be aligned with SSG's. His first task could be to negotiate a settlement with Kyko before they get any additional ammunition and over the next few years to manage and protect SSG's reputation. While the talent pool for this assignment is limited I am sure you can find someone with the right skill sets to bring on board.
>
> Let me know if I can be of assistance.

76.     Kyko, Mr. Kulkarni, and Tejesh Srivastav & Associates then continued their harassment and intimidation of investors.  In March 2017, at the direction of Kyko and Mr. Kulkarni, "Norman Clarke" contacted an SSG university endowment investor, falsely accused SSG and its principals of criminal conduct, and "urge[d]" the investor to "reconsider its investments in SSG Capital":

> I urge the University ███████ to reconsider its investments in SSG Capital because from information and documents (included in this email), it would appear that Shyam, Edwin and SSG Capital participated in a scheme that if not downright illegal was certainly unethical.

77.     The "information and documents" were primarily materials Kyko had obtained from Ms. Vuppalapati's hard drive, as well as an affidavit that Mr. Kulkarni had filed in the Washington federal litigation.

78.     Norman Clarke then concluded his initial email with a threat:

> Given this overwhelming evidence I am sure that you will agree that at the very least these actions of Shyam and Edwin do not meet the high standards that the University ███████ expects from the individuals it entrusts to manage its funds and if you still wanted to give them the benefit of doubt then have the circumstances thoroughly investigated before continuing to have them manage your money so that in the event the DOJ does hand down indictments against those involved the University and you ███████ are not left red faced.

79.     About a month later, at the direction of Kyko and Mr. Kulkarni, Norman Clarke sent a follow-up email to the investor, making more threats about "publicity" and embarrassment for the investor, and threatening that "this matter could be escalated to the large donors of the University as early as next week."  Norman Clarke's email, which threatened that "[t]hi[s] matter is not going away," was meant to intimidate and harass:

24

> 3. All evidence relating to the massive fraud by Prithvi and its founders has been handed over to the United States authorities who have been in touch with the victims seeking clarifications as they pursue this rather complex investigation across three continents. It would not be a surprise if the authorities should decide to indict the perpetrators of these frauds. This would leave you in the unenviable position of having trusted the University funds with (at the very least) cohorts of people indicted for fraud.

80.     Later that year, at the direction of Kyko and Mr. Kulkarni, "Jason Williams III" contacted the same investor and made similar threats of legal action and publicity by "a famous journalist," suggesting that the investor would be identified in the story:

> It is very possible that in early January a famous journalist will be carrying this story. She has written extensively on the cozy relationships that PE fund managers have with the investors in these funds – where some investors not only do a shoddy due diligence but also turn a blind eye to any evidence of wrong doing even when it is being handed to them on a platter.

81.     Jason Williams III then instructed the investor to persuade SSG to "settle the matter at the earliest" to avoid the bad publicity and other negative repercussions threatened:

> While it is not my place to act as an advisor to ▮ this may be the right time to consider evaluating remaining invested in SSG.
>
> The next best alternative may be to use your good offices with SSG advising them to settle the matter at the earliest. Weeks will be too late. SSG also, after these indictments, may now appreciate the legal jeopardy they may well be in.

82.     In a follow-up email, Jason Williams III accused the investor of failing to do enough due diligence and claiming "[y]ou should have walked away from this investment":

> The lesson for ▮▮▮▮ from all this should be thorough due
> diligence.  Before you invested in SSG your diligence report
> should have highlighted the involvement with Prithvi and even a
> cursory Google search would have revealed that SSG founders
> were dealing with people with VERY questionable
> credentials.  You should have walked away from this
> investment.  Now of course it is possible that your difficulty
> would be in explaining the breakdown in your investment
> process that allowed you to invest with SSG.

83.     Around this same time, a grand jury indictment had been issued for Madhavi

Vuppalapati and others.  Kyko and Mr. Kulkarni soon began using the indictment to threaten

SSG principals and investors.  Mr. Kulkarni personally wrote to SSG officers and principals,

attaching Ms. Vuppalapati's indictment, along with various articles that had been published in

India about the Vuppalapatis and the Prithvi entities.  Some or all of these articles were

facilitated or promoted by Kyko or Mr. Kulkarni.  In the email, Mr. Kulkarni again asked "if you

can assist us with collection on the judgment."  *See* Ex. 7.

84.     On July 31, 2018, Tejesh Srivastav contacted one of SSG's business partners,

following up on a previous communication in October 2016.  After describing his close

connection to Mr. Kulkarni, Mr. Srivastav described the indictment of the Vuppalapatis,

threatened impending publicity and legal costs, and attempted to persuade the business partner to

"convince Shyam Maheshwari that indeed it may be in his interest to resolve this matter"

because "Kiran is not going to go away."  Ex. 12 (July 31, 2018 Srivastav Email).  He explained:

> I spoke to Kiran Kulkarni (CEO of Kyko Global) this evening in an effort to diffuse the situation, and
> am meeting him tomorrow as well.  I believe he can be amenable to settling this matter saving both
> parties time and legal costs and of course the attendant publicity.

I am also happy if you so desire to prepare a time-line and show the documents to you because I think you are the best person to convince Shyam Maheshwari that indeed it may be in his interest to resolve this matter as he is such a significant shareholder and ███████████████ Kiran is not going to go away and is determined to take this matter to its logical conclusion.

85.    On August 2, 2018, less than two months before filing this lawsuit, Mr. Kulkarni again emailed employees and principals of SSG Capital Management seeking a meeting in Mumbai. Ex. 7. When SSG did not agree to Mr. Kulkarni's proposed meeting, Mr. Kulkarni directed that a new round of Anonymous Email threats begin, aimed at SSG, its principals, and its investors. The threats explicitly cited Kyko's intent to file a RICO suit if Mr. Kulkarni's settlement demands were not met. The Anonymous Emails also spelled out that Kyko and Mr. Kulkarni would engage in abusive litigation tactics and use the pendency of a RICO claim to create negative publicity and tarnish the reputations of SSG, its principals, and its investors. All this came true when SSG Fund I and SSG Capital Management refused to accede to Mr. Kulkarni's demands.

86.    At the direction of Kyko and Mr. Kulkarni, Jason William III again emailed an investor and threatened that "soon this will all blow up and will certainly get in the public domain" and warned that Kyko and Mr. Kulkarni—"the folks who lost the money"—were "very tenacious and will keep pursuing this":

> Attached is a Court Order from the High Court at Hong Kong compelling testimony of the founders of SSG Capital.
>
> You may say what is the big deal.  Well the significance is that the folks who lost the money are very tenacious and will keep pursuing this.
>
> This is not the end of the matter.  Unless SSG resolves this and soon this will all blow up and will certainly get in the Public domain.
>
> Best regards,
>
> JW

87.     Days later, at the direction of Kyko and Mr. Kulkarni, Sanjay Seth again contacted Mr. Maheshwari, threatening that Kyko would soon file "a civil lawsuit invoking RICO," warning of the impact on SSG's investors, and claiming that negative publicity and increased regulatory scrutiny were soon to follow:

> 6.   If a civil lawsuit invoking RICO is filed I think you may have to disclose it to ███████████████████ among others and to the University Endowments ██████████ who have invested with you because I am sure that if they were to learn of it from other sources they may get a tad antsy – not to mention that in case of an adverse ruling the award can be tripled.
> 7.   You may also wish to consider how RBI may react to this should a major Indian newspaper carry the story of the civil lawsuit. There are already journalists questioning your cosy relationship with ████████ – I am sure they would like to dig into a story with a complete paper trail documenting how $35.4 million moved  to the US and back only to disappear.

88.     Sanjay Seth specifically touted that Kyko would use the contents from Madhavi Vuppalapati's computer in the impending RICO suit.  He threatened that a lawsuit from Kyko could result in criminal investigations, as had occurred with the Vuppalapatis:

> I am sure that you remember that it was a civil lawsuit by Kyko that
> resulted in indictments of your cohorts. Kyko has been meticulous –
> integrity of evidence has been preserved by using external agencies to
> carry off Madhavi's computer from the Sheriff's office. That battle
> to keep out evidence from the computer has been fought and lost. You
> could of course try again but what is the likelihood of the results
> being different.

89.    As a further effort by Kyko and Mr. Kulkarni, Sanjay Seth offered to help

"facilitat[e]" a settlement with Kyko, but he warned that time was running out:

> I once again offer you my assistance in helping resolve this matter
> before all the dots are connected and the enormity of the evidence
> they have becomes evident to Kyko – as even today all the dots are not
> connected. I remain confident that my today friend can be
> instrumental in facilitating a reasonable settlement. Once the photo
> develops (with my friend's assistance), that option vanishes.

> My hunch is that a lawsuit is imminent and the hour glass is soon
> going to be empty. However, I remain prepared to do my best for you
> should you so decide.

90.    On August 20, 2018, at the direction of Kyko and Mr. Kulkarni, "Currimboy

Tata" contacted an SSG investor, falsely accusing SSG and its principals of illegal actions,

threatening that Kyko would soon be "filing a civil RICO claim," and attempting to pressure the

investor to cause problems for SSG:

> While Kyko has to wait to get them on the stand, you as an investor can ask that question - indeed you should have asked that question at the time of investment - if beneficial owners in the SSG funds are indicted criminals in the United States. Indeed there are documents that very strongly suggest that at least $21.4 million of the GP's commit are funds for which the founders of PISL are the beneficial owners and Shyam Maheshwari, Edwin Wong and Andreas Vourloumis are mere fronts.   Kyko is filing a civil RICO claim based on the documents that prove the nexus between the founders of PISL and the SSG funds not least of which is the timing - Maheshwari et al got their hands on the ill-gotten funds in September 2010 and launched their first fund in Dec 2010!!!

91.     Among the statements made by "Currimboy Tata" is that, presumably with reference to the $21.4 million of the "GP's commit," SSG's Fund I was seeded by "ill-gotten funds in September 2010." This statement is false. SSG has unassailable and documented proof that seed money for SSG Fund I was in fact ultimately funded from severance payments that SSG founders, including Mr. Maheshwari, Mr. Wong and Mr. Vourloumis, received from a well-known Japanese financial institution.

92.     Kyko and Mr. Kulkarni, conspiring and working with, among others, Tejesh Srivastav & Associates, either sent these Anonymous Emails themselves, or caused all these Anonymous Emails to be sent. Because Kyko has no legitimate claims against anyone associated with SSG, their purpose of these communications was to extract a settlement through threats, harassment, and intimidation.

**D.     September 2018 – Present: Kyko files this suit to advance their media smear campaign and investor harassment, and apply settlement pressure.**

93.     Having failed to extract a settlement with their investor harassment and threatening communications, including the Anonymous Emails, Mr. Kulkarni caused Kyko to file this meritless action on September 26, 2018. Immediately, Kyko and Mr. Kulkarni began

using this lawsuit—and the RICO count in particular—to further Kyko's ongoing scheme of harassment, intimidation, and covert settlement pressure.

### 1. Kyko and Mr. Kulkarni improperly use the RICO suit as a bargaining chip in their covert campaign.

94.     As soon as Kyko filed this lawsuit, Kyko and Mr. Kulkarni tried to ramp up the covert settlement pressure.  On September 30, 2018, at the direction of Kyko and Mr. Kulkarni, "General Duggal" emailed SSG principals, threatening to use the RICO claim to interfere with SSG's investors, to publicize the lawsuit through a New York Times article, and to embarrass various investors who had previously been warned "about the SSG-Prithvi matters":

> Such an action could be debilitating to SSG and most embarrassing to ▮▮▮▮ who had an inkling about the SSG-Prithvi matters but which you convinced him was not worth pursuing.  You must alert at least ▮▮▮▮ of these developments and ask him who it was that had volunteered to help him. ▮▮▮▮ would absolutely hate to see Gretachen Morgenson or Ellen Barry or Jeffrey Gettleman of the New York Times pick up this story.  Why just ▮▮▮▮ even the other pension funds who were given hints would find themselves in a most awkward situation.

95.     Amidst these threats, General Duggal offered to help "facilitate[e]" a settlement with Kyko to make the harassment and intimidation end:

> I am sure that you will give this email a serious consideration and keep it in mind in taking a decision on the best course of action.  There are individuals who could help facilitate a settlement and of course there is no dearth of good lawyers who would mount a good defense - but the time is here to evaluate your own strengths and weaknesses - some of which I believe Maheshwari has kept from you.

96.     On October 3, 2018, SSG's Hong Kong counsel received a fax from someone identified as "T," which furthered the same themes and attached documents that Kyko had obtained from Madhavi Vuppalapati's computer.  The fax from T sought a quick settlement:

31

> Since investors in the SSG funds are US Pension funds, University endowments and perhaps PISL there are many angles for you to consider before advising on the next steps – which could possible include settling the matter at an early date with all parties that have been involved in this matter.  However, for you to offer the best advice I think you have to prevail on the individuals you represent to be completely forthcoming with you and share all documents they have in their possession.

97.     On October 4, 2018, at the direction of Kyko and Mr. Kulkarni, "Zero Darcy" sent an email to certain SSG principals explaining how Kyko, Mr. Kulkarni, and Tejesh Srivastav intended to use the RICO suit in their ongoing scheme to interfere with investors, stir up media scandals, and apply pressure on SSG:

> The lawsuit by Kyko is the beginning of a strategy that Kyko will follow to recover the funds that they have lost and is designed for maximum repercussions in India with the regulators and on your investors in the US and elsewhere.

98.     Zero Darcy's email explained that "Kyko is working with Tejesh Srivastav" to create regulatory problems and disrupt an active business deal in India.  While pretending to help "alert" the recipients to Kyko's non-litigation tactics, Zero Darcy's email is a transparent threat from Kyko and Mr. Kulkarni designed to strong-arm a settlement, using the baseless RICO claim as leverage.  Zero Darcy includes the usual threats of creating regulatory problems, disrupting investors relationships, and stirring up negative media publicity:

This is a bad situation as, I believe that some serious media players both Indian and international are looking at the story and likely to go to press early next week. Depending on how damaging the story this could very well affect how the RBI and other regulators view SSG's India operations. Tejesh's ultimate objective here is to use his connections and get Gretchen Morgenson to cover this story with a general theme of how cozy the relationship is between the investors and the managers of hedge funds like SSG. Tejesh and Keith Wilson already in the past corresponded on email with some of your investors and sent them details of the Prithvi transaction. The investors have been set up. Now when they hear about a RICO lawsuit they will certainly want cover as this is terribly embarrassing situation that they did nothing despite the warnings. You should be prepared for a very strong reaction from the funds.

On the media strategy Tejesh plans to milk the story fully over at least 2 or 3 articles with the final one carrying the bombshell where a serious fraud by an Indian Bank is mentioned with the hope that this will result in an investigation in India.

99.     Zero Darcy's email clearly says that the prior interference with SSG investors by Tejesh Srivastav and Keith Wilson was a "set up" in order to embarrass the investors in the SSG funds, and that Kyko's RICO suit is intended to coerce them into action and get SSG to settle with Kyko.

100.    On November 11, 2018, Sanjay Seth again emailed SSG's principals, urging them to achieve "a rapid resolution" with Mr. Kulkarni and Kyko since "even a slight delay could lead Kyko's demands escalating quickly." In order to drive up the value of a potential settlement, Sanjay Seth enumerated threats of potential tactics Kyko might use even after obtaining an SSG settlement, since "Kyko has a judgment of over $100 million and even after settling with SSG Kiran may be inclined to pursue the balance." He warned that a confidentiality agreement was essential so that investor information was not "shared with any journalist particularly Gretchen Morgenson of the New York Times." He claimed that Kyko might file lawsuits against other parties, and that "any of these other lawsuits may also have an adverse impact on you," including investigation by authorities in other countries. To prevent this, "getting Kyko to drop all other claims is quite important and a perfect solution." Sanjay Seth further warned that SSG should, as

33

part of a settlement with Kyko, "[e]nsure that Indian media … stops carrying this story and stops digging further," revealing that Kyko had the power to control the media outlets who were issuing the negative articles.  Having listed the possible tactics that Kyko and Mr. Kulkarni planned on using, as a means of maximizing a settlement amount, Sanjay Seth concluded:

> This is not a long list and I am sure with a check in hand you can have an agreement with Kiran and Kyko within a matter of hours.
>
> Good luck.  I am sure you will be hugely relieved when all this is behind you.
>
> Sanjay

101.     Shortly after this Court granted jurisdictional discovery, in September 2019, at the direction of Kyko and Mr. Kulkarni, "R Aggarwal" sent an email to SSG principals threatening additional litigation, regulatory action, and investor disruption.  R Aggarwal claimed that a negative media article about a pension fund's investment in an SSG fund "was a set-up" that "gave a Professionals Union an excuse to start drafting an intervention petition under Federal Rule of Civil Procedure 24(a)(2)…."  R  Aggarwal stated that the purported intervention petition was "being led and coordinated by the person named in" a media article in which Tejesh Srivastav gave statements.

102.     R Aggarwal also threatened that "[t]he same firm," Tejesh Srivastav & Associates, was generating additional litigation and negative publicity:

> 3. The same firm is also preparing a whistleblower complaint so you can expect the regulators to get involved as well and given the ERISSA provisions will be applicable they will be specially interested in flows into this account as SSG's investment activity has picked up with some transactions raising more red flags than other …..
>
> 4. Also, once the whistleblower complaint is filed and the intervention petition filed, you can expect Ted Bunker and Gretchen Morgenson of the Wall Street Journal to do a longish piece or series of stories on the entire Prithvi-SSG Saga.
>
> This promises to be a long and interesting battle …

103.    Shortly after this case was filed, counsel for the SSG Defendants offered in an email solely to Kyko's counsel Joseph Rodkey to accept service on behalf of the SSG Defendants.  Within hours, at the direction of Kyko and Mr. Kulkarni, "General Duggal" emailed principals of the SSG Defendants, once again trying to extract a settlement, and this time revealing particularized knowledge of the email to Mr. Rodkey.

> From: General Duggal [generalduggal946@gmail.com]
> Sent: 17 October 2018 14:27
> To: Wong, Edwin; Cairns, Peter; Vourloumis, Andreas; ▮▮▮▮▮▮
> Subject: [EXTERNAL] Developments
>
> A few hrs ago the Judge in Seattle denied your motion to vacate its' earlier order.
> A few hours after that your lawyer Mike Ginsberg has sought a meeting with Joe Rodkey.
>
> Perhaps all this can lead to a settlement the quantum of which will depend on the BNY Mellon/UCO Bank documents playing their role or not.

104.    During this time, Kyko's legal counsel contorted the SSG Defendants' simple administrative offer of accepting service into a request for a settlement discussion.  Plaintiffs' counsel sent a letter with extensive demands for how the settlement discussion was to proceed. Among other things, Kyko's legal counsel demanded that:  the SSG Defendants "make a good faith settlement offer"; several named individual SSG Defendants personally attend a two-day

settlement discussion; Kyko "remain entitled to pursue any and all legal action against VTC"; the SSG Defendants personally travel to Detroit, Michigan to save Kyko travel costs; and the SSG Defendants refrain from defending Kyko's various lawsuits in the interim.  ECF No. 10-2.

105.    In a style almost identical to Kyko's and Mr. Kulkarni's many pseudonyms, Kyko's general counsel Mr. Macyda also not-so-subtly suggested that Kyko might "refrain from sending/posting adverse correspondence on the internet" so long as the SSG Defendants agreed to settlement discussions on Kyko's terms:

> Please be advised that, prior to receiving your firm's letter, a few media outlets approached Kyko for comment regarding the parties' dispute.  Should the parties agree upon a framework to engage in the Settlement Discussion (discussed further below), Kyko will agree to your clients' request to refrain from sending/posting adverse correspondence on the internet running from the date of acceptance of this letter's terms to the conclusion of the Settlement Discussion (and thereafter should the parties reach an agreement).

106.    For Kyko, this case has always been a bargaining chip to force SSG into settlement discussions.  Early on, Kyko's counsel repeatedly demanded that mediation should occur before any party was permitted to file a dispositive motion.  *See* ECF No. 27-1, at 4 ("Plaintiffs state that the parties should mediate their dispute prior to any dispositive motion being filed.").  This became a theme:  Kyko's counsel consistently tried to delay the case to force the SSG Defendants into settlement talks, proposing that mediation occur only after "*all* Defendants have appeared or default/default judgments have been entered," and, "[i]f mediation is unsuccessful, then this Court should set a briefing schedule regarding the SSG Defendants' Motion to Dismiss."  ECF No. 30 at ¶ 19.

### 2.    Kyko and Mr. Kulkarni improperly use the RICO suit to create negative media publicity.

107.    To further pressure SSG into settlement, Kyko and Mr. Kulkarni immediately began using this case, and the RICO count in particular, to stir up negative media attention about

36

SSG and its principals.  Kyko and Mr. Kulkarni facilitated or promoted at least five media stories about this lawsuit between September and December 2018.

108.    While these stories were being published, Kyko and its legal counsel deliberately stalled the litigation so that its RICO count could continue to be used as the centerpiece of its media smear campaign.  Even after counsel for the SSG Defendants willingly offered to accept service of process, counsel for Kyko refused to serve the SSG Defendants until Judge Phipps ordered service to occur on February 5, 2019.

109.    On September 26, 2018, the very day this lawsuit was filed, Kyko Global Inc. published a press release on the openPR website in which it made a number of false, misleading, or defamatory statements regarding SSG Capital and its principals.  Ex. 13 at 3 (Sept. 26, 2018 openPR Article).  Counsel for SSG sent Kyko a letter explaining that many statements were libelous and requesting that the press release be withdrawn.  Ex. 13 (Oct. 2, 2018 Letter).  Counsel for Kyko agreed to request openPR to remove the article from its website.  Ex. 14 (Oct. 3, 2018 Letter).

110.    Nevertheless, on October 1, 2018, Kyko, Mr. Kulkarni, a "senior official of Kyko Global," and Amit Punde, Kyko Company Secretary and Kyko Advisor, gave a number of false and misleading statements that appeared in a news article entitled "Three Men, Four Questions And A 24 Million Dollar Quandary."[3]  Kyko promoted this article on its website.

111.    Weeks later, on October 25, 2018, Kyko promoted another article entitled "Hong Kong Court Wants to Know, How & Why SSG Capital, Value Team Corp Received About

---

[3] *See* Vinod Kumar Menon, *Three Men, Four Questions And A 24 Million Dollar Quandary*, mid-day.com (Oct. 1, 2018, 16:29 IST), https://www.mid-day.com/articles/three-men-four-questions-and-a-24-million-dollar-quandary/19853165.

$ 23.3 million from Prithvi Infosolutions."[4]  Mr. Kulkarni gave additional statements in this

article, and Kyko promoted the article on its website, along with others, as shown below:

| 5 December 2018 | SSG in battle over a shady Lehman deal; Orix may opt to pick IL&FS renewables assets | https://www.vccircle.com/ssg-in-battle-over-a-shady-lehman-deal-orix-may-opt-to-pick-il-fs-renewables-assets |
| --- | --- | --- |
| 4 December 2018 | The Lehman millions: Did a crooked Hyderabad company and a Hong Kong fund share the spoils of a $50-million investment? | https://www.cnbctv18.com/finance/the-lehman-millions-did-a-crooked-hyderabad-company-and-a-hong-kong-fund-share-the-spoils-of-a-50-million-investment-1584851.htm |
| 14 November 2018 | US Lawsuit Against Prithvi Information Solutions Alleges Rampant Siphoning of Funds | https://www.moneylife.in/article/us-lawsuit-against-prithvi-information-solutions-alleges-rampant-siphoning-of-funds/55733.html |
| 25 October 2018 | Hong Kong Court Wants to Know, How & Why SSG Capital, Value Team Corp Received About $ 23.3 million from Prithvi Infosolutions | https://www.moneylife.in/article/hong-kong-court-wants-to-know-how-and-why-ssg-capital-value-team-corp-received-about-233-million-from-prithvi-infosolutions/55625.html |
| 01 October 2018 | Three Men, Four Questions And A 24 Million Dollar Quandary | https://www.mid-day.com/articles/three-men-four-questions-and-a-24-million-dollar-quandary/19853165 |

112.    On November 14, 2018, Kyko promoted another story entitled, "US Lawsuit

Against Prithvi Information Solutions Alleges Rampant Siphoning of Funds."[5]  The article

primarily rehashed allegations in Kyko's unfounded RICO claim.  Kyko continues to provide a

link to the article on its website.

---

[4] *See Hong Kong Court Wants to Know, How & Why SSG Capital, Value Team Corp Received About $ 23.3 million from Prithvi Infosolutions*, Moneylife (Oct. 25, 2018), https://www.moneylife.in/article/hong-kong-court-wants-to-know-how-and-why-ssg-capital-value-team-corp-received-about-233-million-from-prithvi-infosolutions/55625.html.

[5] *See US Lawsuit Against Prithvi Information Solutions Alleges Rampant Siphoning of Funds*, Moneylife (Nov. 14, 2018), https://www.moneylife.in/article/us-lawsuit-against-prithvi-information-solutions-alleges-rampant-siphoning-of-funds/55733.html.

113.    On December 4, 2018, Kyko promoted a story entitled "The Lehman millions: Did a crooked Hyderabad company and a Hong Kong fund share the spoils of a $50-million investment?"[6]  The news article contains a number of false misleading statements and bears a striking resemblance to Kyko's misrepresentations about SSG in other contexts.  Kyko has promoted this article on its website.

114.    On December 5, 2018, Kyko promoted an article entitled "SSG in battle over a shady Lehman deal…."[7]  The article falsely claims that SSG entities owe money to Prithvi entities:  "Kyko believes it can recover money from PISL through SSG, because the Canadian firm has found that the Hong Kong firm and its unit owe $22.9 million to the infotech company, thanks to a series of transactions executed by these entities."  *Id.*  Kyko continues to promote this article on its website.  *See* Ex. 15 (Kyko Website: In The News).

115.    Kyko and its affiliates have continued to promote and contribute to media stories that impugn SSG's integrity and attempt to cause regulatory and investor problems.

116.    In 2019, Kyko, Mr. Kulkarni, and Tejesh Srivastav & Associates coordinated to disseminate false and misleading statements about SSG and its principals related to a large-scale pension fund's investment with SSG.  Tejesh Srivastav publicized misleading statements about this investment to the press:

---

[6] *See* Jyotindra Dubey, *The Lehman millions: Did a crooked Hyderabad company and a Hong Kong fund share the spoils of a $50-million investment?*, CNBC TV18 (Dec. 4, 2018, 12:35 PM IST), https://www.cnbctv18.com/finance/the-lehman-millions-did-a-crooked-hyderabad-company-and-a-hong-kong-fund-share-the-spoils-of-a-50-million-investment-1584851.htm.

[7] Ankit Agarwal, *SSG in battle over a shady Lehman deal; Orix may opt to pick IL&FS renewables assets*, VCCircle (Dec. 5, 2018), https://www.vccircle.com/ssg-in-battle-over-a-shady-lehman-deal-orix-may-opt-to-pick-il-fs-renewables-assets.

> Officials at Kyko told me they are surprised that some U.S. public institutions are plunging into troubled private-company investments in India. "Prudence dictates that [investors] handling public funds should in no way risk these moneys with managers without impeccable credentials," said Tejesh Srivastav, a Cornell-educated investment banker who is advising Kyko chief executive Kiran Kulkarni. Raising money for a "crooked company," as he called Vuppalapati's former firm, "is not a profile that inspires confidence."

117.   This statement was designed to impugn SSG's integrity and create problems for the investor by suggesting that it had failed to perform adequate due diligence before making its investment with SSG. Tejesh Srivastav made this statement in order to further his agenda of stirring up conflict and litigation that would put more settlement pressure on SSG.

118.   Using a media article that Kyko had contributed to and helped promote, Kyko's general counsel, Mr. Macyda, sought confidential documents regarding the pension fund and its investment through a Pennsylvania Right-to-Know Law Request. Mr. Macyda sought private documents and communications between SSG and the investor, including "all communications regarding [the pension fund's] decision to invest $300 Million with SSG as referenced in the attached article."

119.   Mr. Macyda purported to act on behalf of PSI, which was a defunct, inoperative entity under Delaware law at the time. Kyko did not own PSI (and has never owned PSI), and had no authority to act on PSI's behalf.

120.   The Right-to-Know request was filed by Kyko's general counsel to further Kyko's agenda of harassing SSG and its investor.

121.   Mr. Macyda's demands were denied by an Appeals Officer of the Pennsylvania Office of Open Records.

122.    Kyko continued to falsely attack SSG and its investors by contributing to and promoting another public media article, which was issued after this Court made its jurisdictional ruling in March 2020.  Tejesh Srivastav, again speaking for Kyko, opined that this Court's decision "underlines the seriousness of the allegations" and criticized the retirement fund's decision to invest in an SSG fund:

> As far as it goes, the ruling "destroys SSG's position that Kyko's claim are without merit," and "underlines the seriousness of the allegations," according to Tejesh Srivastav, an India- and New York-based investment adviser who has been following the case. He said the decision also bolsters criticisms ██████████████████████ who often votes against private investments, and told the London Financial Times last year that the state would "save a fortune" if it stopped hiring high-fee private investment managers, who he says typically do no better than cheap index funds ██████████████

123.    To strong-arm SSG into unjustified settlement negotiations and force a pay-off, Kyko engaged in a media campaign to publish, contribute to, and promote news stories about the RICO claim.  Kyko explicitly used its negative media campaign as settlement leverage as early as October 2018, when Kyko's counsel offered Kyko's silence in the media in exchange for the SSG Defendants' agreement to participate in settlement negotiations:

> Please be advised that, prior to receiving your firm's letter, a few media outlets approached Kyko for comment regarding the parties' dispute.  Should the parties agree upon a framework to engage in the Settlement Discussion (discussed further below), Kyko will agree to your clients' request to refrain from sending/posting adverse correspondence on the internet running from the date of acceptance of this letter's terms to the conclusion of the Settlement Discussion (and thereafter should the parties reach an agreement).

124.    The import of this offer is clear:  settle the case and the negative publicity will end.  This case was never maintained to litigate the merits of Kyko's claims, but rather as a

critical piece in Kyko's "scorched earth strategy" of negative media publicity and investor disruption.

### 3.    Kyko and Mr. Kulkarni improperly use the RICO suit to interfere with SSG's investors and business relations to extract a settlement.

125.    As described above, Kyko and Mr. Kulkarni, along with Tejesh Srivastav & Associates, began interfering with SSG's investors as early as January 2017, attempting to disrupt SSG's business relationships, to persuade investors to withdraw investments in SSG funds, and to generate litigation by investors against SSG.  That interference is still continuing.

126.    As explained in threatening email from "Zero Darcy," Kyko's directed contacts with SSG investors were designed to further pressure those investors once the RICO claim was filed:

> Tejesh and Keith Wilson already in the past corresponded on email with some of your investors and sent them details of the Prithvi transaction.  The investors have been set up.  Now when they hear about a RICO lawsuit they will certainly want cover as this is terribly embarrassing situation that they did nothing despite the warnings.  You should be prepared for a very strong reaction from the funds.

127.    Kyko continued to target new SSG investors.  As described above, Kyko promoted news articles criticizing SSG's investors and has sought confidential information from investors to harass, intimidate, and increase settlement pressure on SSG.

128.    Kyko also attempted to get information during jurisdictional discovery about SSG's investors.  *See* ECF No. 73-2, at 8 (citing ECF No. 45-5 and 45-6).  Kyko's discovery requests were not relevant to jurisdiction and were included solely to obtain information to harass investors and increase settlement pressure.  When the SSG Defendants objected and declined to produce documents, Kyko filed a sanctions motion, ECF No. 83, which the Court denied, ECF No. 101.

129.     Kyko has continued to interfere with SSG's business operations and relationships including by continuing with its meritless RICO claim made in this case.  In April 2020, shortly after this Court's jurisdictional ruling, "Robi Khabro" began sending emails and documents to employees of a company that was being acquired by SSG.  The emails explicitly urged the employees to take actions that would prevent SSG's acquisition.

130.     Robi Khabro false allegations about SSG and told employees to contact the Reserve Bank of India ("RBI") with details about Kyko's lawsuit here: "Details of this must be provided to the RBI and made public through the media…. Kyko's lawsuit and its implications should be clearly spelt out to RBI."

131.     Robi Khabro also provided information for how the employees could create negative media publicity—by contacting journalists who had previously criticized SSG—and further interfere with SSG's investors:



132.     Robi Khabro included documents that Kyko regularly uses to attack SSG and its principals—Madhavi Vuppalapati's indictment; documents obtained from Madhavi Vuppalapati's computer—but they also attached names and email addresses for SSG's investor contacts, lawyers, and other business relations.

133.     Kyko has continued to interfere with SSG's business relationships.  Kyko continues to use this lawsuit, particularly its RICO count, to attempt to tarnish SSG's name,

create regulatory problems in various countries, disrupt investor relationships, derail business

deals, and interfere with investments—all to put improper settlement pressure on SSG.

**III.    Kyko, Mr. Kulkarni, and their associates have abused this action and legal processes in order to maintain their covert harassment scheme.**

134.    This case, at its core, is a sham.  And everything Kyko, Mr. Kulkarni, and their

legal counsel have done in this case has been calculated to maintain the existence of this suit in

order to prop up their covert harassment campaign.

**A.    Kyko, Mr. Kulkarni, and their legal counsel filed this suit and asserted false claims without factual support in order to ramp up settlement pressure.**

135.    In order to ramp up its campaign, Kyko filed this action in September 2018,

asserting two groups of claims against the SSG Defendants.  First, Kyko alleged a civil RICO

claim and state-law tort claims, asserting that the Bond Proceeds comprising the non-refundable

deposits, which passed only briefly through PSI's bank account, were actually "stolen" from PSI

because PSI and PISL had executed an internal agreement under which only PSI was allowed to

"use and possess" the Bond Proceeds.  Second, Kyko alternatively alleged that the wire transfers

were instead part of a "loan transaction" in which PSI "loaned" money to SSG Fund I and VTC

pursuant to "loan agreements."  Kyko alleged that these "loans" were "due and payable upon

demand."  And, based on SSG Fund I's and VTC's purported failure to comply with the terms of

the "loan agreements," Kyko alleged breach of contract and similar equitable claims.

136.    These allegations are untrue.  Kyko and Mr. Kulkarni made false allegations and

filed this lawsuit to add more pressure on SSG to agree to their improper demands.  Kyko and

Mr. Kulkarni have no desire to litigate the merits of their claims; they seek only to abuse legal

processes in this action to maintain their scheme.

### 1. PSI had no exclusive right to "use and possess" the Bond Proceeds.

137.    The lynchpin of Kyko's civil RICO and tort claims is its assertion that PSI—and only PSI—had any right to "use and possess" the Bond Proceeds.  ECF 1 at ¶¶ 200, 201.  This contention is false.  And Kyko and Mr. Kulkarni knew it was false when they filed this case.

138.    Nothing in the documents relating to the Bonds' issuance supports Kyko's theory.  The Bond Circular stated only generally that PISL "intends to use the net proceeds of this offering for investments in overseas subsidiaries [plural] and overseas acquisitions [plural] *and any other use as may be permitted under applicable law or regulations*."  Ex. 1 at 39 (Bond Circular) (emphasis added).  The Bond Proceeds were also placed in an escrow account, from which PSI had no authority to apply for release of funds.  *Id.* at 1, 40, 45–47.  Indeed, PSI did not even exist when the Bonds were issued.  *Compare* Ex. 1 at 1 (Bond Circular) (Bond issue date of February 26, 2007), *with* ECF 109-6 at 7 (PSI incorporation date of June 27, 2007).

139.    Yet Kyko falsely alleged: "PISL and PSI entered into an agreement wherein the Bonds were issued for the benefit of PSI and the Bonds funds were to be used solely by PSI to execute business operations in the United States"—the "PISL-PSI Agreement."  ECF 1 at ¶ 101.

140.    On information and belief, the PISL-PSI Agreement does not exist.

141.    Nor could the PISL-PSI Agreement have existed without violating the rights of SSG Fund I and VTC as Bondholders under the Bond Circular and related documents.

142.    Neither Kyko, nor Mr. Kulkarni, nor their legal counsel possesses a copy of the PISL-PSI Agreement.  On information and belief, they have never even seen such a copy, as it does not exist.

143.    Indeed, available evidence only refutes Kyko's allegation:

    a.    The Bond Proceeds, to the extent they were ever transferred from PISL to PSI, were treated only as a "loan" from the parent PISL to its subsidiary PSI that was "re-payable on demand."

45

b. PISL's and PSI's available financial documents nowhere reflect that the Bond Proceeds were ever treated as "belonging to PSI" under an agreement or otherwise.

c. Kyko's theory that PISL pledged away the Bond Proceeds to its subsidiary that did not exist when the Bonds were issued and thereby precluded PISL's ability to satisfy its outstanding debt to the Bondholders is absurd on its face.

d. The Bond Circular bound not just PISL, but the entire Prithvi Group, to restrictive covenants in favor of the Bondholders. Thus, even assuming an internal agreement exists somewhere on paper between PISL and PSI, SSG Fund I and VTC were still entitled to the Bond Proceeds as assets to satisfy the Prithvi Group's debt, regardless of which entity might have possessed the funds internally.

144. On information and belief, Kyko and Mr. Kulkarni simply made up the existence of the PISL-PSI Agreement so that Kyko could assert a civil RICO claim and tort claims in order to maintain their campaign.

145. Kyko and Mr. Kulkarni intend to use the coerced testimony of Guru Pandyar—a known liar and a convicted fraudster who has a clear incentive to lie for Kyko's benefit—to substantiate their false allegations. *See* ECF No. 207-3, at 5.

**2. There were never loans between PSI and any of the SSG Defendants.**

146. Kyko alleges the existence of "loan agreements" between PSI on one side, as lender, and SSG Fund I and VTC, as borrowers, on the other. *See* ECF 1 at ¶¶ 48, 127, 131, 291–298. Kyko alleges that these purported loans are "due and payable upon demand" and that SSG Fund I and VTC have breached the purported loan agreements by refusing "to make payment to PSI." *Id.* ¶¶ 293, 297.

147. These allegations are false and unsupportable. There are no such loan agreements. There never were such loan agreements. None of the SSG Defendants has ever executed a loan agreement with PSI.

148.     Kyko and Mr. Kulkarni knew when they filed the Complaint that no loan agreements have ever existed between PSI and any of the SSG Defendants.  Yet they maliciously asserted false allegations not only that loan agreements exist, but also that they are "due and payable" and that SSG Fund I and VTC have breached them.

149.     To cover up that they knowingly alleged false and misleading facts to assert claims against the SSG Defendants, Kyko and Mr. Kulkarni purport rely on indirect and non-credible sources to show the supposed existence of "loan agreements."

150.     First, Kyko and Mr. Kulkarni purport to rely on PSI's "books and records."  In particular, Kyko points to an unaudited "balance sheet" of PSI's as of March 31, 2013 (the "March 2013 Balance Sheet").  *See* ECF 109-6 at 10.

151.     The March 2013 Balance Sheet—to the extent it reflects any amounts owed from any of the SSG Defendants to PSI—is false and fraudulent.

152.     Kyko and Mr. Kulkarni knew when they filed the Complaint that the March 2013 Balance Sheet is false and fraudulent.

153.     Indeed, as Kyko itself discovered in 2013, and as Mr. Kulkarni has previously sworn in several affidavits elsewhere, most "accounts receivable" listed on the books of Prithvi entities are false and fraudulent.  *See* ECF 154-3 at ¶ 7 ("[M]ost of these receivables [on the books of Prithvi entities] are bogus."); *see also* Ex. 16 at ¶ 19 (June 17, 2013 Kulkarni Affidavit) (explaining Prithvi's "counterfeit," "forged," and "sham" books and records); Ex. 17 ¶ 10 (August 7, 2013 Kulkarni Affidavit) (asserting that "98%" of Prithvi's accounts receivable "were falsified"); Ex. 17 ¶ 17 (asserting that PSI and its owners had a "practice of fabricating accounts receivable").  Mr. Kulkarni stated that Ms. Vuppalapati told him in mid-2013 that because the Prithvi accounting system contained "incriminating data," she was working to "clean it up."  Ex.

17 ¶ 11.  And Madhavi Vuppalapati has specifically admitted that the amounts shown as "Loans and Advances" in the March 2013 Balance Sheet do not reflect collectable debts.  *See* Ex. 8 ¶ 40.

154.     Second, Kyko purports to rely on a report of PSI's auditor, Ram Associates, as of March 31, 2013.  *See* Ex. 18 (March 2013 PSI Audit Report).  In particular, Kyko relies on a line item for "Notes Receivable" in the amount of $33,950,000.  *Id.* at 5.

155.     Yet nothing in that audit report reflects that PSI ever loaned money to SSG Fund I or VTC pursuant to "loan agreements" or otherwise.  In fact, Note 5 to the audit report states that the nearly $34,000,000 in "'Notes receivable' … consists of advances to an unrelated entity."  *Id.* at 12.  A nearly identical line item—"notes receivable" comprising "advances to an unrelated entity"—also appeared in PSI's audited financials from March 2010, well *before* any of *PSAL*'s transactions with the SSG Defendants had occurred.  Ex. 19 at 89, 93 (PISL 2010 Annual Report).

156.     Kyko also has no basis to rely on the audit reports of Ram Associates.  In 2015, after invalidly obtaining the shares of Agadia Systems, Inc. in the Washington Collection Proceedings, Kyko and Mr. Kulkarni sued Ram Associates on behalf of Agadia in New Jersey state court, alleging that Ram Associates fraudulently cooked the books of PISL, PSI, and Agadia with accounting errors and omissions.  *See Agadia Systems, Inc. v. Ramachandran*, No. MRS-L-2285-15 (N.J. Super. Ct.).  As a result, Mr. Kulkarni swore in his July 20, 2016 Affidavit to the tribunal in Hong Kong that he is "very hesitant to rely on the accuracy of the Audited Financial Statements[.]"  Ex. 8 at ¶ 30.

157.     In short, Kyko and Mr. Kulkarni knew when they filed the Complaint that PSI never had "loan agreements" with any SSG Defendant.  Despite repeated requests for documents that Plaintiffs relied on to allege there were loan agreements, Kyko and its counsel have evaded,

delayed, and refused to produce *anything* supporting these allegations.  *See* ECF Nos. 167, 207, 208.  And their purported reliance on "accounts receivable" and an audit report *that they themselves have alleged to be false and fraudulent* is not just unconvincing—it is also malicious, calculated only to support and maintain their covert pressure scheme.

> **B.**   **Kyko, Mr. Kulkarni, and their legal counsel have knowingly submitted and relied upon affidavits containing false and misleading statements.**

158.   Kyko has submitted at least five affidavits in this action by Mr. Kulkarni, Guru Pandyar, and David Amorose, each signed under penalty of perjury, despite knowing that these affidavits contain false and misleading statements specifically calculated to mislead.  Kyko has filed false and misleading affidavits to maintain the existence of this lawsuit to support and increase settlement pressure.

159.   ***First***, on February 28, 2019, Kyko's legal counsel filed an affidavit by Mr. Kulkarni in opposition to the SSG Defendants' Motion to Dismiss.  *See* ECF 40-1.  Mr. Kulkarni affirmed a number of false and misleading statements under penalty of perjury, including:

| In Mr. Kulkarni's February 28, 2019 Affidavit | In Reality |
|---|---|
| • "PISL is registered to do business in Pittsburgh, Pennsylvania with its principal place of business in the United States located in Pittsburgh."  *Id.* ¶ 6.<br><br>• "PISL's Pittsburgh's [sic] office served as PISL's headquarters for its operations in the United States and it appears that Ms. Vuppalapati conducted PSI's operations from Pittsburgh.  Accordingly, Ms. Vuppalapati appears to have been physically located in Pittsburgh during most, if not all, material times at issue in this lawsuit."  *Id.* ¶ 12. | Kyko submitted a sworn affidavit by Guru Pandyar under penalty of perjury in the Washington Federal Litigation, asserting that:<br><br>• PISL "operated *its United States corporate headquarters[] from Bellevue, Washington*," ECF 154-1 ¶ 4;<br><br>• Satish Vuppalapati "had almost daily communication by emails and phone calls with [Mr. Pandyar] at *the US headquarters of PISL India in Bellevue, Washington*," id. ¶ 7;<br><br>• "the Chairperson of PISL India, *Ms. Vuppalapati … maintained her office at the US headquarters of PISL India in Bellevue, Washington*," id. ¶ 7; |

| In Mr. Kulkarni's February 28, 2019 Affidavit | In Reality |
|---|---|
| | • according to PISL's website, "the address of [PISL's] US Head Quarter [is] '10900 NE 4th, #2300, Bellevue, WA 98004," id. ¶ 8;<br><br>• "all of the board of directors of PISL India … traveled from India to Bellevue, Washington during 2010 to 2013 on at least two separate occasions … *to visit US headquarters of PISL India*, meet senior management personnel and discuss business strategy," id. ¶ 11; and<br><br>• the PISL board of directors held a meeting in "Bellevue, Washington *which is where the US headquarters of Prithvi India had been since about mid 2010 to early 2014*." Id. ¶ 11. |
| "PISL and PSI entered into an agreement wherein the Bonds were issued for the benefit of PSI and they were to be used solely by PSI to execute business operations in the United States." *Id.* ¶ 8; *see id.* ¶ 35. | There is no evidence that the PISL-PSI Agreement exists or has ever existed. *See supra.* |
| "Defendants created Memorandums of Understanding and Addendums to give the false appearance that SSG Capital Partners, VTC, and PISL entered into agreements to restructure the Bonds. Moreover, it appears that Defendant Ira Noor Vourloumis purportedly signed these documents on behalf of SSG Capital Partners and VTC." Id. ¶ 40. | The Fraudulent PISL MOUs are false, forged documents. *See supra.* |
| "The SSG Defendants had a corporate affiliation with PISL and/or PSI and Prithvi Asia as equity holders." Id. ¶ 42. | No SSG Defendant has ever held any equity interest in PISL, PSI, or PSAL. At most, SSG Fund I and VTC owned the Bonds, which were convertible into equity. |

160.    Kyko and Mr. Kulkarni knew that Mr. Kulkarni's February 28, 2019 Affidavit contained false and misleading statements when he affirmed them under penalty of perjury. Yet

Kyko filed Mr. Kulkarni's affidavit anyway in order to maintain the existence of this lawsuit to support and increase the pressure in its illicit campaign.

161.    **Second** and **third**, on December 16, 2019, Kyko's legal counsel filed two affidavits by David Amorose and Guru Pandyar in opposition to the SSG Defendants' Motion to Dismiss.  *See* ECF 109-6.  Mr. Amorose and Mr. Pandyar each affirmed a number of false and misleading statements under penalty of perjury, including:

| In the December 16, 2019 Affidavits | In Reality |
|---|---|
| "PSI maintained its principal place of business solely in Pittsburgh." ECF 109-6 ¶ 11; *id.* ¶ 4 (David Amorose).<br><br>"PSI … had its principal place of business in Pittsburgh."  ECF 109-13 ¶ 3 (Guru Pandyar). | Kyko submitted a sworn affidavit in November 2014 by Mr. Kulkarni under penalty of perjury in the Washington Collection Proceedings, asserting that:<br><br>"When it was operating until a few months ago, PSI had its offices in Washington and the director and officer [Ms. Vuppalapati] was a Washington resident.  Its base operations were in Bellevue, Washington."  Ex. 23 ¶ 16. |
| "[A]ll operations with respect to the Bond Funds were executed and managed solely in Pittsburgh."  ECF 109-6 ¶ 11 (David Amorose).<br><br>"[A]ll operations with respect to the Bond Funds were executed and managed solely in Pittsburgh."  ECF 109-13 ¶ 5 (Guru Pandyar). | Guru Pandyar clearly admits in his affidavit that he personally handled the wire remittances to PSAL from PSI.  *See* 109-13 at 6–7.  Yet Guru Pandyar swore under penalty of perjury in the Washington Federal Litigation that:<br><br>• "[f]rom early 2010 to around mid of 2014, [he] performed countless activities, on an ongoing basis, on behalf of PISL India, from Bellevue, Washington," ECF 154-1 ¶ 4;<br><br>• he "personally participated in hundreds of telephone calls, and attended numerous meetings, in Bellevue, Washington," *id.* ¶ 5; and<br><br>• he communicated "almost daily" with Satish Vuppalapati from "the US headquarters of PISL India in Bellevue, Washington," *id.* ¶ 7.<br><br>Moreover, the persons and entities with any authority with respect to the Bond Proceeds—Madhavi and Satish Vuppalapati, Guru Pandyar, PISL, the escrow agent, and the trustee—were located in London, India, Hong Kong, and Washington. |

162.    Kyko knew that Mr. Amorose's and Mr. Pandyar's December 16, 2019 affidavits contained false and misleading statements when they affirmed them under penalty of perjury.

Yet Kyko filed these affidavits anyway in order to maintain the existence of this lawsuit to support and increase the pressure in its illicit campaign.

163.    **Fourth** and **fifth**, in mid-2020, when the SSG Defendants raised the fundamental problem of Kyko's lack of standing to this Court, Kyko redoubled its bad faith by submitting false and misleading affidavits by Guru Pandyar and Mr. Kulkarni to cover up their prior misrepresentations and omissions regarding the ownership of PSI.

164.    In particular, in an attempt to disprove that Sojitz's writ of attachment had ever been served, Guru Pandyar swore under penalty of perjury in an August 17, 2020 affidavit that he had "never received any legal process" regarding PSI's shares.  *See* ECF 183-2.

165.    Yet evidence proves that Guru Pandyar not only received legal process for PSI's shares—Sojitz's writ of attachment—but also forwarded it to Satish and Madhavi Vuppalapati in May 2013.  *See* ECF 191-9 at 72.

> **From:** Guru Pandyar [mailto:guru@prithvisolutions.com]
> **Sent:** Thursday, May 9, 2013 8:52 PM
> **To:** 'Satish Vuppalapati'; 'Madhavi Vuppalapati'
> **Subject:** FW: Sojitz v. Prithvi.pdf IMPORTANT: PLEASE READ
>
> FYI...from David Kalson...
>
> Thanks & Regards,
>
> **Guru Pandyar | Prithvi Information Solutions**
> **Asst. Vice President - Operations & Accounts**
> 14711 NE 29th Pl, Ste 110 Bellevue, WA 98007
> ☎: 425.296.5050 🖷: 425.296.5070 ✉:guru@prithvisolutions.com

166.    Kyko and Mr. Pandyar knew that Mr. Pandyar's statements in his August 17, 2020 affidavit were false and misleading when he affirmed them under penalty of perjury.  Yet Kyko filed this affidavit anyway in order to maintain the existence of this lawsuit to support and increase the pressure in its illicit campaign.

167.    Mr. Kulkarni also filed an August 17, 2020 affidavit containing false and misleading statements intentionally calculated to mislead.  *See* ECF 183-3.

168.    Mr. Kulkarni swore in that affidavit under penalty of perjury that Sojitz had abandoned its collection efforts against PISL as of early 2014.  *See* ECF 183-3 ¶¶ 6, 9–12.

169.    Mr. Kulkarni's statements were not only misleading, given that Sojitz had attached PSI's shares *before* 2014, but also false, as evidenced by Sojitz's ongoing collection efforts against PISL in India.  *See* ECF 191-9.

170.    Kyko and Mr. Kulkarni knew that Mr. Kulkarni's statements were false and misleading when he affirmed them under penalty of perjury.  Yet Kyko filed this affidavit anyway in order to maintain the existence of this lawsuit to support and increase the pressure in its illicit campaign

171.     In sum, Kyko and Mr. Kulkarni, through their legal counsel, have filed sworn affidavits containing false and misleading statements in this action with the specific intent to mislead the Court and harm SSG by maintaining this lawsuit to support and increase pressure in Kyko's covert campaign.

### C.    Kyko, Mr. Kulkarni, and their legal counsel deliberately misrepresented the purported ownership of and their authority to sue on behalf of PSI.

172.    Kyko filed this case purporting to allege claims as, and on behalf of, PSI, relying solely on putative "orders" by the referee in the Washington Collection Proceedings.  Kyko specifically alleged in the Complaint that it is the "controlling shareholder of PSI."  ECF 1 ¶ 4.

173.    In reality, however, Kyko has no valid ownership interest in PSI:

a.    Kyko has no certificated shares of PSI, nor any other proof of ownership.

b.    Kyko relies solely on an illegitimate referee order in the Washington Collection Proceedings purporting to order PSI to turn over its shares to Kyko Global GmbH.  The referee's order is invalid under Washington law and had no operative effect.  *See* ECF No. 191.  Referees in supplemental proceedings

have no authority to adjudicate substantive property rights and the Superior Court had no authority to delegate such power to the referee.  Nor is there is any process under Washington law to order or otherwise require the direct turnover of property from a debtor to a creditor, much less allow the creditor to then unilaterally appraise the property for its own benefit.  *See id.*

c.     Additionally, the referee's order acknowledged that the ownership of PSI's shares was substantially disputed because Madhavi Vuppalapati had told him that she had already turned PSI's shares over to Sojitz Corporation pursuant to writ-of-attachment proceedings in Delaware four years earlier.  Neither the referee nor the Superior Court followed any of the required statutory procedures for resolving such an ownership dispute before purporting to turn over PSI to Kyko.

d.     Ms. Vuppalapati's statement to the referee regarding the earlier turnover of PSI's shares to Sojitz appears validated by clear attachment proceedings instituted in Delaware by Sojitz for the shares of PSI in 2013, as well as emails in 2013 between Sojitz representatives and Satish Vuppalapati to transfer PSI's shares.  *See* ECF No. 191-9.

e.     Moreover, Kyko's reliance on the referee's order is belied by its own actions.  Over a year *after* the referee purported to order PSI to turn over its shares to Kyko, and months *after* Kyko told the referee that it had already appraised PSI at $10, Kyko initiated attachment proceedings in Delaware to obtain PSI's shares, asserting that they were then still "owned by Prithvi Information Solutions, Ltd."

f.     Kyko did not even wait for the writ of attachment for PSI's shares to issue in Delaware before it filed this case and fraudulently alleged in a signed filing that Kyko was the "controlling shareholder" of PSI.

174.    Kyko and Mr. Kulkarni were well aware when they filed the Complaint that Kyko did not validly own PSI.  Yet they and their legal counsel purported to litigate this case for nearly two years under the false pretense of owning a named plaintiff, willfully concealing Kyko's lack of ownership from the Court and the SSG Defendants in order to maintain the existence of this case to further their covert harassment campaign.  Kyko similarly misrepresented the capacity of PSI to litigate this suit since it was a void entity until August 11, 2020, when—during the initial case management conference—Mr. Kulkarni purported to "revive" PSI in Delaware, even though he has no such authority.

**D.      Kyko, Mr. Kulkarni, and their legal counsel have repeatedly attempted to delay proceedings until after "all" defendants had appeared.**

175.    For Kyko's extortionate campaign to be effective, this lawsuit needed to remain pending long enough that it could be advertised in Kyko-promoted news articles and used to threaten and intimidate SSG and its investors.  To keep the case pending, Kyko and its counsel have repeatedly delayed proceedings so that the covert harassment campaign could continue.

176.    Kyko's plan first became clear when counsel for the SSG Defendants tried to accept service of the complaint and Plaintiffs' counsel refused.  Despite repeated requests, Plaintiffs' counsel refused to serve the SSG Defendants until February 5, 2019, over four months after the case was filed, arguing that no party could file any Rule 12 motions until all parties "had an opportunity to appear in this case" and until after mediation had occurred.  ECF No 16, at 13; ECF No. 29, at 7.  Plaintiffs' counsel ultimately delayed service until Judge Phipps ordered them to serve the SSG Defendants.  Feb. 5, 2019 Transcript, at 13.

177.    Kyko has further attempted to delay proceedings by yoking the SSG Defendants to co-defendants—Madhavi Vuppalapati, PISL, and PSAL—who Kyko knew would not appear, and then using the non-appearance of those co-defendants to stall the litigation.

178.    Mr. Kulkarni alleged at this case's outset that Madhavi Vuppalapati had "fled the United States" and had "secreted herself" somewhere in India.  ECF No. 13-3, ¶ 3.  Kyko's counsel has continued to argue that "Ms. Vuppalapati … [is] attempting to hide from the U.S. Justice Department…."  ECF No. 153, ¶ 13.  Kyko also knew that Ms. Vuppalapati did not appear for the Washington federal trial and was now subject to a judgment of over $100 million from that case.  In short, Kyko has always known Ms. Vuppalapati will not appear here.

179.    Kyko also knows that PISL is no longer an operational company.  *See, e.g.*, ECF No. 11-4, ¶ 5; ECF No 11, at ¶ 6.  And Kyko has not yet served PSAL.  ECF No. 167.

180.    Nevertheless, Kyko and its counsel have repeatedly sought to delay proceedings by claiming that the case could not proceed without those non-appearing defendants.  For example, Kyko's counsel argued:

a.    "All" Defendants should appear before the Court could hold a scheduling conference.  ECF No. 16.

b.    "All" Defendants should appear before Rule 12 motions could be filed.  ECF Nos. 29, 30.

c.    The SSG Defendants' motion to dismiss should "either be stricken temporarily or be stayed to allow, again, the rest of the Defendants an opportunity to appear."  Feb. 5, 2019 Transcript, at 13.

d.    Madhavi Vuppalapati should be required "to appear … to give deposition testimony" "in Pittsburgh … given [her] known contacts with the United States and Pennsylvania."  ECF No. 41, ¶ 27; ECF No. 45, at 7 n.7.

e.    The SSG Defendants' reconsideration motion could not be determined until Kyko could compel testimony from the Vuppalapatis.  ECF No. 151, ¶ 24

f.    The Court could not resolve subject matter jurisdiction until depositions of the Vuppalapatis, who were "hiding from the U.S. Justice Department," were completed.  ECF No. 153 ¶¶ 12–13.

g.    Kyko cannot produce essential documents because they are "in the possession of third parties/Ms. Vuppalapati/Satish Vuppalapati…."  ECF No. 167, at 10-11; *see also* ECF No. 159 (claiming the Vuppalapatis destroyed documents, even though Kyko has refused to produce Ms. Vuppalapati's computer, which contains over 300,000 documents, ECF No. 208).

h.    Kyko and its legal counsel, despite bringing multimillion-dollar contract claims, produced no documents, vaguely claiming, "we believe that the Vuppalapatis may have documentation regarding these receivables in India and we have initiated legal action in India to compel this documentation…." ECF No. 207-3, at 2.

181.    Kyko knows these parties will not appear, and their claimed need for information from them is a ruse.  Kyko has been litigating against Prithvi since 2013, and Mr. Kulkarni has hundreds of thousands of Ms. Vuppalapati's documents and tens of thousands of her emails, all from the relevant time period.  ECF Nos. 207-7, ¶ 4 n.1; ECF No. 208.

182.    Kyko and its counsel made these arguments solely to delay these proceedings, prevent dismissal, and misrepresent the true circumstances of the case.

**E.    Kyko, Mr. Kulkarni, and their legal counsel have knowingly relied on forged and fraudulent documents to assert and maintain their claims.**

183.    Kyko alleged that VTC and SSG Fund I executed "restructuring agreements" with "PISL." *See* ECF 1 at ¶¶ 107–08, 111–12, 134–35.  These agreements, Kyko asserts, were "illegal under applicable Indian law, rules, and regulations." *See id.* at 109, 113, 136.

184.    These allegations are false.  As shown in Exhibits 2, 3, and 4, the Restructuring MOUs were each executed by *PSAL*, not PISL.

185.    Kyko, Mr. Kulkarni, and their counsel have known that these allegations are false.

186.    Kyko based its allegations on documents in its possession that appear similar to the Restructuring MOUs, but contain signatures on behalf of *PISL*, as well as forged, fraudulent signatures on behalf of SSG Fund I and VTC (the "Fraudulent PISL MOUs").  True and Correct copies of the Fraudulent PISL MOUs are attached as Exhibits 20, 21, and 22.

187.    Although it is unknown at this point who specifically forged these documents, it is indisputable that *none* of the SSG Defendants or any of their agents, officers, or employees ever signed the Fraudulent PISL MOUs.  Indeed, the fraudulent signature on the Fraudulent PISL MOUs—forged as though by Ira Syavitri Noor—does not even remotely look like Ms. Noor's actual signature.

188.    Upon information and belief, Kyko and Mr. Kulkarni have known for years that the Fraudulent PISL MOUs are fraudulent, forged documents.

189.    Yet Kyko and Mr. Kulkarni have knowingly and willfully relied on the Fraudulent PISL MOUs in order to assert and maintain their false claims.

190.    Kyko, Mr. Kulkarni, and their legal counsel have failed to correct their improper reliance on fraudulent documents before this Court at any point during this case.

## COUNTS

### COUNT I – Abuse of Process
### Against Kyko Global, Inc., Kyko Global GmbH, and Kiran Kulkarni

191.    SSG hereby incorporates by reference all preceding paragraphs as through restated completely in this Count.

192.    Kyko, Mr. Kulkarni, and their legal counsel have abused (and continue to abuse) legal process within this case to inappropriately extend litigation, drive up defense costs, and drain the resources of SSG Fund I and SSG Capital Management.

193.    As explained more fully in the preceding paragraphs, Kyko and Mr. Kulkarni have abused these proceedings by filing frivolous and bad-faith claims, deliberately delaying proceedings, refusing to serve the SSG Defendants for over four months, engaging in frivolous motion practice, filing motions and briefs in bad faith, making false and misleading statements in briefs, alleging facts that are contradicted by facts established in prior legal actions, knowingly relying on fraudulent documents to assert claims, submitting false and misleading affidavits that were in direct contravention to sworn affidavits, knowingly relying on unreliable witness testimony, seeking default judgments in bad faith, refusing to produce relevant discovery, litigating for two years on behalf of a void entity, misrepresenting ownership of a named Plaintiff, and engaging in other inappropriate litigation activity.

194.    Kyko and Mr. Kulkarni have also used these abusive legal practices and bad-faith litigation techniques to prevent dismissal of this meritless case so that it can be used in further media smear campaigns, additional investor harassment and business disruption, and the ongoing effort to extract money from SSG Fund I, SSG Capital Management, and their principals.

195.     Kyko and Mr. Kulkarni took these actions primarily to accomplish purposes for which the legal process was not designed:  to extract money from SSG; to harass SSG; to drain the resources of and cause financial harm to SSG; and to delay the present litigation.

196.     These actions are a perversion of the legal process.

197.     Kyko's and Mr. Kulkarni's actions described herein were willful, wanton, and reckless, aimed only to harm SSG and extract an unjustified settlement.

198.     SSG was harmed by these actions, and the harm includes but is not limited to, the costs of defending this meritless action, the additional costs of defending Kyko's abusive litigation tactics, the costs of defending against Kyko's and Mr. Kulkarni's covert campaign, reputational damages, and the resulting damage to SSG's business.

199.     Although Kyko's legal counsel are not named in this Count as defendants, their actions described above reflect willful and knowing furtherance of Kyko's and Mr. Kulkarni's scheme.  SSG Fund I and SSG Capital Management specifically reserve their rights to amend these pleadings to name Kyko's legal counsel as defendants and to seek sanctions at a later date.

**WHEREFORE**, SSG Fund I and SSG Capital Management respectfully request the Court to enter a money judgment against Kyko and Mr. Kulkarni and award SSG compensatory damages, attorneys' fees and costs, and punitive damages, injunctive relief prohibiting Kyko and Mr. Kulkarni from falsely communicating with SSG's investors and any other SSG stakeholders about SSG, and any other relief that this Court deems proper.

### COUNT II – Aiding and Abetting Abuse of Process
### Against Kiran Kulkarni

200.     SSG hereby incorporates by reference all preceding paragraphs as through restated completely in this Count.

60

201.    As set forth more fully above, Kyko, Mr. Kulkarni, and their legal counsel have willfully abused legal processes in this action.

202.    Kiran Kulkarni, as CEO of Kyko, knew that Kyko was abusing processes in this action.

203.    Kiran Kulkarni, as CEO of Kyko, caused and directed many of the abusive litigation tactics to occur, thereby substantially assisting in the abuse.

204.    Moreover, Mr. Kulkarni also substantially assisted and encouraged the abusive, bad-faith litigation tactics in this action by, among other things, knowingly signing and causing to be filed affidavits containing false and misleading statements.

205.    Mr. Kulkarni knew that Kyko's abuse-of-process scheme was primarily done to improperly extract money from SSG, to harm SSG's reputation, to further delay the litigation, to harass SSG, and to cause financial harm to SSG, making statements to these ends or directing others to do the same.

206.    Mr. Kulkarni intended to assist Kyko abuse legal processes in this action in order to improperly extract money from SSG, harm SSG's reputations and business interests, further delay the litigation, and harass SSG.

207.    Mr. Kulkarni's actions described herein were willful, wanton, and reckless, aimed only to harm SSG and extract an unjustified settlement.

208.    SSG was harmed by these actions, and the harm includes but is not limited to, the costs of defending this meritless action, the additional costs of defending Kyko's abusive litigation tactics, the costs of defending against Kyko's and Mr. Kulkarni's covert campaign, reputational damages, and the resulting damage to SSG's business.

209.    Although Kyko's legal counsel are not named in this Count as defendants, their actions described above reflect willful and knowing furtherance of furthering Kyko's and Mr. Kulkarni's scheme.  SSG Fund I and SSG Capital Management specifically reserve their rights to amend these pleadings to name Kyko's legal counsel as defendants and to seek sanctions at a later date.

**WHEREFORE**, SSG Fund I and SSG Capital Management respectfully request the Court to enter a money judgment against Kyko and Mr. Kulkarni and award SSG compensatory damages, attorneys' fees and costs, and punitive damages, injunctive relief prohibiting Kyko and Mr. Kulkarni from falsely communicating with SSG's investors and any other SSG stakeholders about SSG, and any other relief that this Court deems proper.

### COUNT III – Concert of Action
### Against Kyko Global, Inc., Kyko Global GmbH, and Kiran Kulkarni

210.    SSG hereby incorporates by reference all preceding paragraphs as through restated completely in this Count.

211.    Kyko and Mr. Kulkarni committed abuses of process as outlined above.

212.    Kyko and Mr. Kulkarni took these actions in concert with each other and pursuant to a common design and scheme as previously set forth herein.

213.    Kyko's and Mr. Kulkarni's actions described herein were willful, wanton, and reckless, aimed only to harm SSG and extract an unjustified settlement.

214.    SSG was harmed by these actions, and the harm includes but is not limited to, the costs of defending this meritless action, the additional costs of defending Kyko's abusive litigation tactics, the costs of defending against Kyko's and Mr. Kulkarni's covert campaign, reputational damages, and the resulting damage to SSG's business.

215.    Although Kyko's legal counsel are not named in this Count as defendants, their actions described above reflect willful and knowing furtherance of furthering Kyko's and Mr. Kulkarni's scheme.  SSG Fund I and SSG Capital Management specifically reserve their rights to amend these pleadings to name Kyko's legal counsel as defendants and to seek sanctions at a later date.

**WHEREFORE**, SSG Fund I and SSG Capital Management respectfully request the Court to enter a money judgment against Kyko and Mr. Kulkarni and award SSG compensatory damages, attorneys' fees and costs, and punitive damages, injunctive relief prohibiting Kyko and Mr. Kulkarni from falsely communicating with SSG's investors and any other SSG stakeholders about SSG, and any other relief that this Court deems proper.

### COUNT IV – Tortious Interference with Contractual Relations
### Against Kyko Global, Inc., Kyko Global GmbH, and Kiran Kulkarni

216.    SSG hereby incorporates by reference all preceding paragraphs as through restated completely in this Count.

217.    SSG Capital Management and SSG Fund I have numerous contracts with their investors (known as limited partners).

218.    As described above, Kyko and Mr. Kulkarni took actions specifically intending to harm SSG Capital Management's and SSG Fund I's relationships with investors.

219.    These actions include, but are not limited to, harassing investors with false and malicious communications, including the Anonymous Emails, inappropriately spreading false and misleading information regarding SSG Capital Management, SSG Fund I, and their principals, and leveraging this lawsuit to encourage investors to file suit against SSG.

220.    These actions were not privileged or justified because they were not taken for any legitimate business purpose for Kyko or Mr. Kulkarni.

221.    These actions further were not privileged or justified because they were done specifically with the intent to harm SSG Fund I and SSG Capital Management and to serve as further leverage in Kyko's and Mr. Kulkarni's covert campaign against SSG.

222.    Kyko's and Mr. Kulkarni's actions described herein were willful, wanton, and reckless, aimed only to harm SSG and extract an unjustified settlement.

223.    SSG Fund I and SSG Capital Management suffered actual legal damages as a result of Kyko's and Mr. Kulkarni's actions, including the significant costs incurred in responding to their covert campaign and harassing communications to investors, including the Anonymous Emails, lost business and revenue, and the significant unjustified harm to their reputations.

**WHEREFORE**, SSG Fund I and SSG Capital Management respectfully request the Court to enter a money judgment against Kyko and Mr. Kulkarni and award SSG compensatory damages, attorneys' fees and costs, and punitive damages, injunctive relief prohibiting Kyko and Mr. Kulkarni from falsely communicating with SSG's investors and any other SSG stakeholders about SSG, and any other relief that this Court deems proper.

### COUNT V – Civil Conspiracy
### Against Kyko Global, Inc., Kyko Global GmbH, and Kiran Kulkarni

224.    SSG hereby incorporates by reference all preceding paragraphs as through restated completely in this Count.

225.    Kyko Global, Inc. committed unlawful acts by, including but not limited to, abusing legal processes, intentionally interfering with SSG Fund I's and SSG Capital Management's investment contracts, and attempting to extract an unwarranted settlement.

226.     Kyko Global GmbH committed unlawful acts by, including but not limited to, abusing legal processes, intentionally interfering with SSG Fund I's and SSG Capital Management's investment contracts, and attempting to extract an unwarranted settlement.

227.     Mr. Kulkarni committed unlawful acts by, including but not limited to, abusing legal processes, intentionally interfering with SSG Fund I's and SSG Capital Management's investment contracts, and attempting to extract an unwarranted settlement.

228.     As explained above, Kyko Global, Inc., Kyko Global GmbH, and Mr. Kulkarni combined and coordinated their acts, along with those of others—including, but not limited to, Tejesh Srivastav, Guru Pandyar, Kyko's legal counsel, and others as set forth above—in order to unlawfully extract money from SSG Fund I and SSG Capital Management through their combined actions.

229.     As explained above, Kyko Global, Inc., Kyko Global GmbH, and Mr. Kulkarni all acted solely with the purpose to injure, intimidate, and harass SSG to obtain an unwarranted settlement.

230.     Kyko Global, Inc., Kyko Global GmbH, and Mr. Kulkarni each took overt acts in furtherance of this conspiracy by, for example, directing and coordinating a public smear campaign, coordinating malicious false communications to investors, including the Anonymous Emails, filing this baseless lawsuit, signing, filing, or otherwise drafting affidavits containing false and misleading statements, and engaging in a concerted campaign to discredit SSG and unlawfully extract money from SSG Fund I and SSG Capital Management through their combined actions.

231.     Kyko's and Mr. Kulkarni's actions described herein were willful, wanton, and reckless, aimed only to injure, intimidate, and harass SSG Fund I and SSG Capital Management.

232.    SSG Fund I and SSG Capital Management suffered actual legal damages as a result of Kyko's and Mr. Kulkarni's actions, including the significant costs incurred in responding to their covert campaign and harassing communications to investors, including the Anonymous Emails, lost business and revenue, and the significant unjustified harm to their reputations.

233.    Although Kyko's legal counsel are not named in this Count as defendants, their actions described above reflect willful and knowing furtherance of furthering Kyko's and Mr. Kulkarni's scheme.  SSG Fund I and SSG Capital Management specifically reserve their rights to amend these pleadings to name Kyko's legal counsel as defendants and to seek sanctions at a later date.

**WHEREFORE**, SSG Fund I and SSG Capital Management respectfully request the Court to enter a money judgment against Kyko and Mr. Kulkarni and award SSG compensatory damages, attorneys' fees and costs, and punitive damages, injunctive relief prohibiting Kyko and Mr. Kulkarni from falsely communicating with SSG's investors and any other SSG stakeholders about SSG, and any other relief that this Court deems proper.

## <u>JURY DEMAND</u>

SSG Fund I and SSG Capital Management demand a jury trial as to all issues so triable.

66

Respectfully submitted,

Dated:  September 25, 2020

/s/  *John D. Goetz*
Michael H. Ginsberg (Pa. Bar #43582)
John D. Goetz (Pa. Bar #47759)
Douglas Baker (Pa. Bar #318634)
Connor J. Baer (Pa. Bar #322459)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219-2514
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959
Email: mhginsberg@jonesday.com
Email: jdgoetz@jonesday.com
Email: ddbaker@jonesday.com
Email: cbaer@jonesday.com

**Counsel for Defendants SSG Capital
Partners I, L.P., SSG Capital Management
(Hong Kong) Limited, Value team
Corporation, Shyam Maheshwari, Ira
Syavitri Noor a/k/a Ira Noor Vourloumis,
Dinesh Goel, Wong Ching Him a/k/a Edwin
Wong, and Andreas Vourloumis**